RENDELL-BAKER ET AL. *v.* KOHN ET AL.

No. 80–2102.   Argued April 19, 1982—Decided June 25, 1982

BURGER, C. J., delivered the opinion of the Court, in which BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 843. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 844.

*Zachary R. Karol* argued the cause for petitioners. With him on the briefs were *S. Elaine Renfro*, *Alan Jay Rom*, and *John Reinstein*.

*Matthew H. Feinberg* argued the cause for respondents and filed a brief for respondents Kohn et al. *Francis X. Bellotti*, Attorney General of Massachusetts, *pro se*, *Betty E. Waxman* and *Leah S. Crothers*, Assistant Attorneys General, and *Thomas R. Kiley*, First Assistant Attorney General, filed a brief for respondents Bellotti et al.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether a private school, whose income is derived primarily from public sources and which is regulated by public authorities, acted under color of state law when it discharged certain employees.

## I

## A

Respondent Kohn is the director of the New Perspectives School, a nonprofit institution located on privately owned

---

*\*Carolyn Grace* filed a brief for the Massachusetts Association of 766 Approved Private Schools, Inc., as *amicus curiae* urging affirmance.

property in Brookline, Massachusetts. The school was founded as a private institution and is operated by a board of directors, none of whom are public officials or are chosen by public officials. The school specializes in dealing with students who have experienced difficulty completing public high schools; many have drug, alcohol, or behavioral problems, or other special needs. In recent years, nearly all of the students at the school have been referred to it by the Brookline or Boston School Committees, or by the Drug Rehabilitation Division of the Massachusetts Department of Mental Health. The school issues high school diplomas certified by the Brookline School Committee.

When students are referred to the school by Brookline or Boston under Chapter 766 of the Massachusetts Acts of 1972, the School Committees in those cities pay for the students' education.[1] The school also receives funds from a number of other state and federal agencies. In recent years, public funds have accounted for at least 90%, and in one year 99%, of respondent school's operating budget. There were approximately 50 students at the school in those years and none paid tuition.[2]

---

[1] Chapter 766, 1972 Mass. Acts, Mass. Gen. Laws Ann., ch. 71B, § 3 (West Supp. 1981), requires school committees to identify students with special needs and to develop suitable educational programs for such students. Massachusetts Gen. Laws Ann., ch. 71B, § 4 (West Supp. 1981), provides that school committees may "enter into an agreement with any public or private school, agency, or institution to provide the necessary special education" for these students. A student identified as having special needs and recommended for placement in private school may remain in public school, if his parents object to a placement in a particular private school, unless he is especially disruptive or dangerous. Parents who object to placement in a particular private school may also elect to place their child in a private school of their choice; in such cases, they must pay the tuition.

[2] *Amicus curiae* Massachusetts Association of 766 Approved Private Schools, Inc., of which the New Perspectives School is a member, informs the Court that many of its members have a student population which is more or less evenly divided between students referred and paid for by the State and students referred and paid for by their parents or guardians. Brief as *Amicus Curiae* 3.

To be eligible for tuition funding under Chapter 766, the school must comply with a variety of regulations, many of which are common to all schools. The State has issued detailed regulations concerning matters ranging from record-keeping to student-teacher ratios. Concerning personnel policies, the Chapter 766 regulations require the school to maintain written job descriptions and written statements describing personnel standards and procedures, but they impose few specific requirements.

The school is also regulated by Boston and Brookline as a result of its Chapter 766 funding. By its contract with the Boston School Committee, which refers to the school as a "contractor," the school must agree to carry out the individualized plan developed for each student referred to the school by the Committee. See n. 1, *supra*. The contract specifies that school employees are not city employees.[3]

The school also has a contract with the State Drug Rehabilitation Division. Like the contract with the Boston School Committee, that agreement refers to the school as a "contractor." It provides for reimbursement for services provided for students referred to the school by the Drug Rehabilitation Division, and includes requirements concerning the services to be provided. Except for general requirements, such as an equal employment opportunity requirement, the agreement does not cover personnel policies.

While five of the six petitioners were teachers at the school, petitioner Rendell-Baker was a vocational counselor hired under a grant from the federal Law Enforcement Assistance Administration, whose funds are distributed in Massachusetts through the State Committee on Criminal Justice. As a condition of the grant, the Committee on Criminal Justice must approve the school's initial hiring decisions. The purpose of this requirement is to insure that the school hires vocational counselors who meet the qualifications

---

[3] The record does not contain details of the school's contract with the Brookline School Committee.

described in the school's grant proposal to the Committee; the Committee does not interview applicants for counselor positions.

## B

Rendell-Baker was discharged by the school in January 1977, and the five other petitioners were discharged in June 1978. Rendell-Baker's discharge resulted from a dispute over the role of a student-staff council in making hiring decisions. A dispute arose when some students presented a petition to the school's board of directors in December 1976, seeking greater responsibilities for the student-staff council. Director Kohn opposed the proposal, but Rendell-Baker supported it and so advised the board. On December 13, Kohn notified the State Committee on Criminal Justice, which funded Rendell-Baker's position, that she intended to dismiss Rendell-Baker and employ someone else. Kohn notified Rendell-Baker of her dismissal in January 1977.

Rendell-Baker then advised the board of directors that she had been discharged without due process because she exercised her First Amendment rights. She demanded reinstatement or a hearing. The school agreed to apply a new policy, calling for appointment of a grievance committee, to consider her claims. Rendell-Baker also complained to the State Committee on Criminal Justice, which asked the school to provide a written explanation for her discharge. After the school complied, the Committee responded that it was satisfied with the explanation, but notified the school that it would not pay any backpay or other damages award Rendell-Baker might obtain from it as a result of her discharge. The Committee told Rendell-Baker that it had no authority to order a hearing, although it would refuse to approve the hiring of another counselor if the school disregarded its agreement to apply its new grievance procedure in her case. At this point Rendell-Baker objected to the composition of the grievance committee, and its proceedings apparently never went forward. Rendell-Baker filed this suit in July 1977

under 42 U. S. C. § 1983, alleging that she had been discharged in violation of her rights under the First, Fifth, and Fourteenth Amendments.

In the spring of 1978, students and staff voiced objections to Kohn's policies. The five petitioners other than Rendell-Baker, who were all teachers at the school, wrote a letter to the board of directors urging Kohn's dismissal. When the board affirmed its confidence in Kohn, students from the school picketed the home of the president of the board. The students were threatened with suspension; a local newspaper then ran a story about the controversy at the school. In response to the story, the five petitioners wrote a letter to the editor in which they stated that they thought the prohibition of picketing was unconstitutional. On the day the letter to the editor appeared, the five teachers told the president of the board that they were forming a union. Kohn discharged the teachers the next day. They brought suit against the school and its directors in December 1978. Like Rendell-Baker, they sought relief under § 1983, alleging that their rights under the First, Fifth, and Fourteenth Amendments had been violated.

## C

On April 16, 1980, the District Court for the District of Massachusetts granted the defendant's motion for summary judgment in the suit brought by Rendell-Baker. A claim may be brought under § 1983 only if the defendant acted "under color" of state law.[4] The District Court took as its standard "'whether there is a sufficiently close nexus between the State and the challenged action of the regulated

---

[4] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

entity so that the action of the latter may be fairly treated as that of the State itself,'" quoting *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974). Noting that, although the State regulated the school in many ways, it imposed few conditions on the school's personnel policies, the District Court concluded that the nexus between the school and the State was not sufficiently close so that the action of the school in discharging Rendell-Baker could be considered action of the Commonwealth of Massachusetts.

Nine days earlier, on April 7, 1980, a different judge of the District Court for the District of Massachusetts had reached a contrary conclusion on the same question in the case brought by the other five petitioners. His opinion stressed the school's dependency on public funding and its regulation by numerous public entities. It also noted that although education was not a uniquely public function, it is primarily a public function, and that Brookline did not maintain a school to serve maladjusted adolescents with drug, alcohol, or emotional problems. The District Court, following the guidelines of *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 722 (1961), concluded that the school performed a "public function," as described in *Jackson, supra,* at 352. Accordingly, it held that the defendants acted under color of state law and denied the motion to dismiss. However, on June 13, 1980, noting that there was substantial ground for disagreement on that holding, the District Court certified its order as immediately appealable pursuant to 28 U. S. C. § 1292(b).

## D

The Court of Appeals for the First Circuit consolidated the two actions. It noted that the school's funding, regulation, and function show that it has a close relationship with the State. However, it stressed that the school is managed by a private board and that the State has relatively little involvement in personnel matters. It concluded that the school, al-

though regulated by the State, was not dominated by the State, especially with respect to decisions involving the discharge of personnel. The Court of Appeals then concluded that the District Court which certified the question in the action brought by the five teachers had erred in concluding that the defendants acted under color of state law.

The Court of Appeals separately considered Rendell-Baker's claim that she was discharged under color of state law since her position was funded directly by the Committee on Criminal Justice. The court rejected her claim, noting that the Committee had the power to insure that those hired had the qualifications described in the grant proposal, but that it did not have any other control over the school's personnel decisions. It therefore affirmed the District Court's dismissal of her action. 641 F. 2d 14 (1981).

We granted certiorari, 454 U. S. 891 (1981), and we affirm.

## II

### A

Petitioners do not claim that their discharges were discriminatory in violation of Title VII of the Civil Rights Act of 1964. Nor do they claim that their discharges were unfair labor practices in violation of the National Labor Relations Act. Rather, they allege that respondents violated 42 U. S. C. § 1983, see n. 4, *supra,* by discharging them because of their exercise of their First Amendment right of free speech and without the process due them under the Fourteenth Amendment. Although Title VII and the National Labor Relations Act govern action by private parties making personnel decisions, it is fundamental that the First Amendment prohibits governmental infringement on the right of free speech. Similarly, the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities. *Civil*

*Rights Cases,* 109 U. S. 3, 11 (1883); *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948).[5] And § 1983, which was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of state law.

In *United States* v. *Price,* 383 U. S. 787, 794, n. 7 (1966), the Court stated:

> "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."

See also, *United States* v. *Classic,* 313 U. S. 299, 326 (1941). The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights "fairly attributable to the State?" *Lugar* v. *Edmondson Oil Co., post,* at 937. The core issue presented in this case is not whether petitioners were discharged because of their speech or without adequate procedural protections, but whether the school's action in discharging them can fairly be seen as state action.[6] If the action of the respondent school is not state action, our inquiry ends.

---

[5] The Fourteenth Amendment provides, in pertinent part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

[6] The Court has concluded that the acts of a private party are fairly attributable to the state on certain occasions when the private party acted in concert with state actors. For example, in *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 155–156 (1970), the issue was whether a restaurant violated § 1983 by refusing service to a white teacher who was in the company of six Negro students; the town sheriff arrested the white teacher for vagrancy as a result of her request to be served lunch in their company. The Court concluded that the restaurant acted under color of state law because it conspired with the sheriff, a state actor, in depriving the white teacher of federal rights.

Similarly, *Flagg Brothers, Inc.* v. *Brooks,* 436 U. S. 149 (1978), and *Lugar, post,* p. 922, illustrate the relevance of whether action was taken in

## B

In *Blum* v. *Yaretsky, post,* p. 991, the Court analyzed the state action requirement of the Fourteenth Amendment. The Court considered whether certain nursing homes were state actors for the purpose of determining whether decisions regarding transfers of patients could be fairly attributed to

---

concert with a state actor. The issue in *Flagg Brothers* was whether a warehouseman could be sued under § 1983 because it sought to execute a lien by selling goods in its possession pursuant to § 7–210 of the New York Uniform Commercial Code. While the sale was authorized by a state statute, and hence appeared to be threatened under color of state law, the Court did not reach that issue. Instead, it concluded that the warehouseman's decision to threaten to sell the goods was not "properly attributable to the State of New York," 436 U. S., at 156, since no state actor was involved. Since the respondent in *Flagg Brothers* claimed that the warehouseman violated her Fourteenth Amendment rights to due process and equal protection, and the Fourteenth Amendment is only offended by action of the state, we held that no claim for relief had been stated.

In *Lugar,* a lessee obtained an *ex parte* writ of attachment pursuant to a state statute, which was executed by a sheriff. The Court held that § 1983 applied because the involvement of the sheriff distinguished the case from *Flagg Brothers. Post,* at 941. The lessee thus acted under color of state law and the sheriff's involvement satisfied the state action requirement.

The limited role played by the Massachusetts Committee on Criminal Justice in the discharge of Rendell-Baker is not comparable to the role played by the public officials in *Adickes* and *Lugar.* The uncontradicted evidence presented by the school showed that the Committee had the power only initially to review the qualifications of a counselor selected by the school to insure that the counselor met the requirements described in the school's grant application. 641 F. 2d 14, 28 (1981). The Committee had no power to hire or discharge a counselor who had the qualifications specified in the school's grant application. Moreover, the Committee did not take any part in discharging Rendell-Baker; on the contrary, it attempted to use leverage to aid her. It requested an explanation for her discharge from the school and stated that it would not approve the appointment of a successor unless a grievance committee considered Rendell-Baker's case. As the Court of Appeals correctly concluded, there is no evidence that the Committee had any authority to take even those steps. *Ibid.*

the State, and hence be subjected to Fourteenth Amendment due process requirements. The challenged transfers primarily involved decisions, made by physicians and nursing home administrators, to move patients from "skilled nursing facilities" to less expensive "health-related facilities." *Post*, at 1005. Like the New Perspectives School, the nursing homes were privately owned and operated. *Post*, at 1003. Relying on *Flagg Brothers, Inc.* v. *Brooks*, 436 U. S. 149 (1978); *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974); *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972); and *Adickes* v. *S. H. Kress Co.*, 398 U. S. 144 (1970), the Court held that, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Post*, at 1004. In determining that the transfer decisions were not actions of the State, the Court considered each of the factors alleged by petitioners here to make the discharge decisions of the New Perspectives School fairly attributable to the State.

First, the nursing homes, like the school, depended on the State for funds; the State subsidized the operating and capital costs of the nursing homes, and paid the medical expenses of more than 90% of the patients. *Post*, at 1011. Here the Court of Appeals concluded that the fact that virtually all of the school's income was derived from government funding was the strongest factor to support a claim of state action. 641 F. 2d, at 24. But in *Blum* v. *Yaretsky*, we held that the similar dependence of the nursing homes did not make the acts of the physicians and nursing home administrators acts of the State, and we conclude that the school's receipt of public funds does not make the discharge decisions acts of the State.

The school, like the nursing homes, is not fundamentally different from many private corporations whose business de-

pends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.

The school is also analogous to the public defender found not to be a state actor in *Polk County* v. *Dodson*, 454 U. S. 312 (1981). There we concluded that, although the State paid the public defender, her relationship with her client was "identical to that existing between any other lawyer and client." *Id.*, at 318. Here the relationship between the school and its teachers and counselors is not changed because the State pays the tuition of the students.

A second factor considered in *Blum* v. *Yaretsky* was the extensive regulation of the nursing homes by the State. There the State was indirectly involved in the transfer decisions challenged in that case because a primary goal of the State in regulating nursing homes was to keep costs down by transferring patients from intensive treatment centers to less expensive facilities when possible. Both state and federal regulations encouraged the nursing homes to transfer patients to less expensive facilities when appropriate. *Post*, at 1007–1008, 1009–1010. The nursing homes were extensively regulated in many other ways as well. The Court relied on *Jackson,* where we held that state regulation, even if "extensive and detailed," 419 U. S., at 350, did not make a utility's actions state action.

Here the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters. The most intrusive personnel regulation promulgated by the various government agencies was the requirement that the Committee on Criminal Justice had the power to approve persons hired as voca-

tional counselors. Such a regulation is not sufficient to make a decision to discharge, made by private management, state action. See n. 6, *supra.*

The third factor asserted to show that the school is a state actor is that it performs a "public function." However, our holdings have made clear that the relevant question is not simply whether a private group is serving a "public function." We have held that the question is whether the function performed has been "traditionally the *exclusive* prerogative of the State." *Jackson, supra,* at 353; quoted in *Blum* v. *Yaretsky, post,* at 1011 (emphasis added). There can be no doubt that the education of maladjusted high school students is a public function, but that is only the beginning of the inquiry. Chapter 766 of the Massachusetts Acts of 1972 demonstrates that the State intends to provide services for such students at public expense. That legislative policy choice in no way makes these services the exclusive province of the State. Indeed, the Court of Appeals noted that until recently the State had not undertaken to provide education for students who could not be served by traditional public schools. 641 F. 2d, at 26. That a private entity performs a function which serves the public does not make its acts state action.[7]

Fourth, petitioners argue that there is a "symbiotic relationship" between the school and the State similar to the relationship involved in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961). Such a claim is rejected in *Blum* v. *Yaretsky,* and we reject it here. In *Burton,* the Court held that the refusal of a restaurant located in a public parking garage to serve Negroes constituted state action. The Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the sup-

---

[7] There is no evidence that the State has attempted to avoid its constitutional duties by a sham arrangement which attempts to disguise provision of public services as acts of private parties. Cf. *Evans* v. *Newton,* 382 U. S. 296 (1966) (private trustees appointed to manage previously public park for white persons only).

port of the garage. 365 U. S., at 723. In response to the argument that the restaurant's profits, and hence the State's financial position, would suffer if it did not discriminate, the Court concluded that this showed that the State profited from the restaurant's discriminatory conduct. The Court viewed this as support for the conclusion that the State should be charged with the discriminatory actions. Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government. No symbiotic relationship such as existed in *Burton* exists here.

C

We hold that petitioners have not stated a claim for relief under 42 U. S. C. § 1983; accordingly, the judgment of the Court of Appeals for the First Circuit is

*Affirmed.*

JUSTICE WHITE, concurring in the judgments.*

The issue in *Blum* v. *Yaretsky*, No. 80–1952, is whether a private nursing home's decision to discharge or transfer a Medicaid patient satisfies the state-action requirement of the Fourteenth Amendment. To satisfy this requirement, respondents must show that the transfer or discharge is made on the basis of some rule of decision for which the State is responsible. *Lugar* v. *Edmondson Oil Co., post*, at 937. It is not enough to show that the State takes certain actions in response to this private decision. The rule of decision implicated in the actions at issue here appears to be nothing more than a medical judgment. This is the clear import of the majority's conclusion that the "decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State," *post*, at 1008, with which I agree.

---

*[This opinion applies also to No. 80–1952, *Blum, Commissioner of the New York State Department of Social Services, et al.* v. *Yaretsky et al., post*, p. 991.]

Similarly, the allegations of the petitioners in *Rendell-Baker* v. *Kohn*, No. 80–2102, fail to satisfy the state-action requirement. In this case, the question of state action focuses on an employment decision made by a private school that receives most of its funding from public sources and is subject to state regulation in certain respects. For me, the critical factor is the absence of any allegation that the employment decision was itself based upon some rule of conduct or policy put forth by the State. As the majority states, "in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Ante*, at 841. The employment decision remains, therefore, a private decision not fairly attributable to the State.

Accordingly, I concur in the judgments.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Petitioners in these consolidated cases, former teachers and a counselor at the New Perspectives School in Brookline, Mass., were discharged by the school's administrators when they criticized certain school policies. They commenced actions under 42 U. S. C. § 1983, claiming that they had been discharged in violation of the First, Fifth, and Fourteenth Amendments. The Court today holds that their suits must be dismissed because the school did not act "under color" of state law. According to the majority, the decision of the school to discharge petitioners cannot fairly be regarded as a decision of the Commonwealth of Massachusetts.

In my view, this holding simply cannot be justified. The State has delegated to the New Perspectives School its statutory duty to educate children with special needs. The school receives almost all of its funds from the State, and is heavily regulated. This nexus between the school and the State is so substantial that the school's action must be considered state action. I therefore dissent.

I

The critical facts of this case deserve restatement. Chapter 766 of the Massachusetts Acts of 1972, Mass. Gen. Laws Ann., ch. 71B, §§ 1–14 (West 1981), provides that all students with special needs are entitled to a suitable publicly funded education under the supervision of the state and local governments. The school committee of every city, town, or school district in Massachusetts must identify all children who, because of physical or emotional disability, have special educational needs. It must prepare an individualized educational program tailored to meet those needs, and arrange for the implementation of that program. The school committee may offer the programs through existing public schools, or it may contract with private schools to implement the programs. If the school committee decides to place a child in a private school, it must bear all the expenses associated with the placement; parents need not pay the tuition.

If a school committee decides to place a child in a private school, it must closely monitor the child's educational progress. Every three months it must determine whether the child can be transferred to a less restrictive environment, such as a public school. 603 Code Mass. Regs. § 28, ¶¶ 502.4(i), 804.2 (1979). In general, special education programs must be provided in the least restrictive environment possible. ¶ 322.2. If the parents object to the placement of their child in private school, the child may remain in public school unless he is disruptive or dangerous. Parents may also place their child in a private school of their own choice. If they do so, however, they must pay the tuition.

As of 1978, all 50 students enrolled at the New Perspectives School were children with alcohol, drug, behavioral, or other special problems. They had been placed there pursuant to Chapter 766 by the town of Brookline, the city of Boston, or the Drug Rehabilitation Division of the Massachusetts Department of Mental Health. None of the students pays

tuition. When they graduate, they receive a diploma certified by the Town of Brookline School Committee.

The New Perspectives School is funded almost entirely by governmental agencies. In fiscal year 1975–1976, public funds accounted for 91% of the school's budget. In fiscal year 1976–1977, public funds accounted for 99% of the budget. The school has received money from the town of Brookline, the Massachusetts Department of Mental Health, the Massachusetts Department of Youth Services, the Massachusetts Division of Family and Children's Services, the Massachusetts Office for Children, and the federal Law Enforcement Assistance Administration. See 641 F. 2d 14, 17 (CA1 1981).

In order to remain eligible for placements and funding under Chapter 766, the New Perspectives School must comply with a variety of regulations. The Massachusetts Department of Education has promulgated "Guidelines for Approval of Day Educational Component in Private Schools under Chapter 766." These guidelines cover almost every aspect of a private school's operations, including financial recordkeeping, student discipline, medical examinations for students, parent involvement, health care, subjects of instruction, teacher-student ratio, student records, confidentiality of records, transportation, insurance, nutrition, food preparation, toileting procedures, physical facilities, and classroom equipment. The guidelines also address personnel policies. They set forth minimum standards for staff training, use of volunteers, teacher qualifications, and teacher evaluations. They further require that the school maintain written job descriptions and a written policy on criteria and procedures for hiring and dismissal, and procedures for handling staff complaints. And they require that the school provide vacations and other benefits.

The New Perspectives School is subject to additional regulation under contracts with each of the governmental units that refers students. A contract with the Massachusetts De-

partment of Mental Health, Drug Rehabilitation Division, requires the school to provide counseling, educational, and vocational services for drug abusers. Under a contract with the city of Boston, the school must carry out the educational plan devised by the Boston School Committee for each Boston student placed with the school. The school must submit periodic reports to the city and is subject to inspection at any time during normal business hours. Finally, the school is bound by regulations contained in contracts with the Massachusetts Department of Youth Services and the Brookline School Committee. See 641 F. 2d, at 18.

## II

The decisions of this Court clearly establish that where there is a symbiotic relationship between the State and a privately owned enterprise, so that the State and a privately owned enterprise are participants in a joint venture, the actions of the private enterprise may be attributable to the State. "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character" that it can be regarded as governmental action. *Evans* v. *Newton*, 382 U. S. 296, 299 (1966). See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961); see also *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974); *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 175 (1972). The question whether such a relationship exists "can be determined only in the framework of the peculiar facts or circumstances present." *Burton, supra*, at 726. Here, an examination of the facts and circumstances leads inexorably to the conclusion that the actions of the New Perspectives School should be attributed to the State; it is difficult to imagine a closer relationship between a government and a private enterprise.

The New Perspectives School receives virtually all of its funds from state sources. This financial dependence on the State is an important indicium of governmental involvement.

The school's very survival depends on the State. If the State chooses, it may exercise complete control over the school's operations simply by threatening to withdraw financial support if the school takes action that it considers objectionable.

The school is heavily regulated and closely supervised by the State. This fact provides further support for the conclusion that its actions should be attributed to the State. The school's freedom of decisionmaking is substantially circumscribed by the Massachusetts Department of Education's guidelines and the various contracts with state agencies. For example, the school is required to develop and comply with written rules for hiring and dismissal of personnel. Almost every decision the school makes is substantially affected in some way by the State's regulations.[1]

The fact that the school is providing a substitute for public education is also an important indicium of state action. The provision of education is one of the most important tasks performed by government: it ranks at the very apex of the function of a State. *Ambach* v. *Norwick*, 441 U. S. 68, 77 (1979).[2] Of course, as the majority emphasizes, *ante*, at

---

[1] The majority argues that the fact that the school receives almost all of its funds from the State is not enough, by itself, to justify a finding of state action. It also contends that the fact that the school is closely supervised and heavily regulated is not enough, by itself, to justify such a finding. *Ante*, at 840–842. I am in general agreement with both propositions. However, when these two factors are present in the same case, and when other indicia of state action are also present, a finding of state action may very well be justified. By analyzing the various indicia of state action separately, without considering their cumulative impact, the majority commits a fundamental error. See also *ante*, at 842–843.

[2] This Court has repeatedly recognized the unique role that education plays in American society. See *Plyler* v. *Doe*, *ante*, at 221 (public education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation"); *Wisconsin* v. *Yoder*, 406 U. S. 205, 221 (1972) (education is necessary to "prepare citizens to participate effectively and intelligently in our open political system"); *Abington School District* v. *Schempp*, 374 U. S. 203, 230 (1963) (BRENNAN, J., concurring)

842, performance of a public function is by itself sufficient to justify treating a private entity as a state actor only where the function has been "traditionally the exclusive prerogative of the State." *Jackson, supra,* at 353. See *Marsh* v. *Alabama,* 326 U. S. 501 (1946); *Smith* v. *Allwright,* 321 U. S. 649 (1944). But the fact that a private entity is performing a vital public function, when coupled with other factors demonstrating a close connection with the State, may justify a finding of state action. Cf. *Evans* v. *Newton, supra.*

The school's provision of a substitute for public education deserves particular emphasis because of the role of Chapter 766. Under this statute, the State is *required* to provide a free education to all children, including those with special needs. Clearly, if the State had decided to provide the service itself, its conduct would be measured against constitutional standards. The State should not be permitted to avoid constitutional requirements simply by delegating its statutory duty to a private entity.[3] In my view, such a delegation does not convert the performance of the duty from public to private action when the duty is specific and the private institution's decisionmaking authority is significantly curtailed.

When an entity is not only heavily regulated and funded by the State, but also provides a service that the State is required to provide, there is a very close nexus with the State.

---

(public education is a "most vital civic institution for the preservation of a democratic system of government"); *Meyer* v. *Nebraska,* 262 U. S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance").

[3] A State may not deliberately delegate a task to a private entity in order to avoid its constitutional obligations. *Terry* v. *Adams,* 345 U. S. 461 (1953). But a State's decision to delegate a duty to a private entity should be carefully examined even when it has acted, not in bad faith, but for reasons of convenience. The doctrinal basis for the state action requirement is that exercises of state authority pose a special threat to constitutional values. A private entity vested with state authority poses that threat just as clearly as a state agency.

Under these circumstances, it is entirely appropriate to treat the entity as an arm of the State. Cf. *Smith* v. *Allwright, supra; Terry* v. *Adams,* 345 U. S. 461, 469 (1953) (opinion of Black, J.). Here, since the New Perspectives School exists solely to fulfill the State's obligations under Chapter 766, I think it fully reasonable to conclude that the school is a state actor.

Indeed, I would conclude that the actions challenged here were under color of state law, even if I believed that the sole basis for state action was the fact that the school was providing Chapter 766 services. Petitioners claim that they were discharged because they supported student demands for increased responsibilities in school affairs, that is, because they criticized the school's educational policies. If petitioners' allegations are true, then the school has adopted a specific view of the sort of education that should be provided under the statute, and refuses to tolerate departures from that view.[4] The State, by refusing to intervene, has effectively endorsed that view of its duties under Chapter 766. In short, because petitioners' criticism was directly addressed

---

[4] This Court has previously emphasized the close relationship between teachers' free speech and the educational process. See *Givhan* v. *Western Line Consolidated School District,* 439 U. S. 410 (1979); *Pickering* v. *Board of Education,* 391 U. S. 563 (1968); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Shelton* v. *Tucker,* 364 U. S. 479 (1960).

The Commonwealth of Massachusetts has recently promulgated regulations recognizing that the role of teachers of special needs students is not limited to course instruction. These regulations provide:

"[T]he candidate will demonstrate that he or she:

1. responds to the needs of individual students so as to enhance their self-esteem and development

2. establishes constructive relationships with parents and others primarily concerned with the well-being of his or her students

3. works to develop a learning environment which is favorable to openness of inquiry and devoid of ridicule." 603 Code Mass. Regs. § 7, ¶ 7.04(40)(f) (1982).

to the State's responsibilities under Chapter 766, a finding of state action is justified.[5]

The majority repeatedly compares the school to a private contractor that "depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government." *Ante*, at 840–841. The New Perspectives School can be readily distinguished, however. Although shipbuilders and dambuilders, like the school, may be dependent on government funds, they are not so closely supervised by the government. And unlike most private contractors, the school is performing a statutory duty of the State.

The majority also focuses on the fact that the actions at issue here are personnel decisions. It would apparently concede that actions directly affecting the students could be treated as under color of state law, since the school is fulfilling the State's obligations to those children under Chapter 766. It suggests, however, that the State has no interest in personnel decisions. As I have suggested, I do not share this narrow view of the school's obligations; the personnel decisions challenged here are related to the provision of Chapter 766 education. In any event, since the school is funded almost entirely by the State, is closely supervised by the State, and exists solely to perform the State's statutory duty to educate children with special needs—since the school is really just an arm of the State—its personnel decisions may appropriately be considered state action.

## III

Even though there are myriad indicia of state action in this case, the majority refuses to find that the school acted under

---

[5] In my view, this connection between the teacher's role and the provision of Chapter 766 education would justify a finding that the State had acted under color of state law, even if the school did not depend solely on Chapter 766 placements. If the school had only one special needs student, and petitioners were discharged for criticizing the school's education of that child, a finding of state action might be justified.

color of state law when it discharged petitioners. The decision in this case marks a return to empty formalism in state action doctrine. Because I believe that the state action requirement must be given a more sensitive and flexible interpretation than the majority offers, I dissent.