Nicholas FEDERSPIEL, et al., Plaintiffs,

v.

OHIO REPUBLICAN PARTY STATE CENTRAL COMMITTEE, et al., Defendants.

Civ. No. 1–94–450.

United States District Court, S.D. Ohio, Western Division.

Nov. 10, 1994.

618

Thomas W. Condit, Condit & Dressing, Cincinnati, OH, for plaintiffs.

Scott W. Spencer, Columbus, OH, for Ohio Republican Party State Cent. Committee.

Mark Christian Bissinger, Frederick Michael Erny, Dinsmore & Shohl, Cincinnati, OH, Powell McHenry, Proctor & Gamble, Cincinnati, OH, Powell McHenry, Dinsmore & Shohl, Cincinnati, OH, for Hamilton County Republican Party.

*ORDER*

SPIEGEL, District Judge.

This matter is before the Court on Defendant Ohio Republican Party's motion to dismiss (doc. 11) and a motion by Defendant Hamilton County Republican Party to dismiss (doc. 12). The Plaintiffs responded to the motion (doc. 14) and the Ohio Republican Party replied (doc. 15). The Court then heard oral argument regarding these motions on October 27, 1994.

After careful consideration of the facts and issues, this Court believes that the Defendants' motion to dismiss is correct. While we sympathize with the Platform Republicans' desire to be heard, their remedy is not to be found in this Court. The proper place for intra-party political disputes to be aired is in the public forum and not within confines of America's courts. Accordingly, we hereby GRANT Defendants' motions and ORDER this case be DISMISSED.

## BACKGROUND

The Plaintiffs, a faction of the Republican Party known as "Platform Republicans," filed this action pursuant to 42 U.S.C. § 1983 alleging that the Defendants' handling of certain internal elections violated their Fourteenth Amendment right to Due Process and Equal Protection of the Laws and their First Amendment right to Free Speech and Freedom of Association. First Amended Complaint (hereinafter "Complaint") (doc. 10). In light of these serious allegations and the complex issues they raise regarding the proper role of the Federal Judiciary and the political parties of America, this Court performed a detailed inquiry into the facts of the case as well as the structure of the Republican Party.

### 1. Structure of the Republican Party

The two main committees of the Hamilton County Republican Party are the Central Committee and the Executive Committee. The Central Committee consists of one member from each election precinct. Republican Constitution (hereinafter "Constitution"), Art. III sec. 1 (1986). Each member is elected for two years by a direct vote of the Party members from his or her precinct. *Id.;* Ohio Rev.Code Ann. § 3517.02 (Anderson, 1988).

Members-elect of the Central Committee, who upon election become voting members, meet between six and fifteen days after the election. The time and place are designated by the retiring chairman of the Central Committee. At this meeting the Committee elects its Chairman, Vice–Chairman, Treasurer and Secretary. The Central Committee then retains the power to fill any vacancies which may occur in such offices. Constitution, Art. III sec. 2.

The Chairman of the Central Committee then calls meetings of the committee to elect members of the Executive Committee. One week after the election of the Executive Committee, the outgoing Executive Committee Chairman calls a meeting of the new Executive Committee to elect a Chairman and Vice–Chairman. Any member of the Executive Committee is eligible for election. Constitution, Art. IV sec. 2.

Once elected the Executive Committee exercises all of the powers of the Hamilton County Republican Party between meetings of the Central Committee. Constitution, Art. IV sec. 3. The Executive Committee may fill any vacancies of party officers, but at the next Central Committee meeting any such actions must be ratified. Constitution, Art. IV sec. 7. Additionally, the Executive Committee can fill any vacancies that occur due to the death or withdrawal prior to election of a Republican Candidate, and select a replacement for a Republican Incumbent upon his or her death or resignation. Constitution, Art. IV sec. 8; Ohio Rev.Code Ann. §§ 3513.30 and 3513.31 (Anderson, 1988).

Finally, if more than one group claims to be the rightful County Central or Executive Committee, each group shall file a list of officers pursuant to Ohio Rev.Code § 3517.06 with the Republican state Central Committee. Ohio Rev.Code § 3517.05 (Anderson, 1988). The state Central Committee must then meet within thirty days of filing to determine which committee shall be recognized as the rightful Central or Executive Committee. *Id.*

## 2. The Dispute Between the Parties

The Plaintiffs, Platform Republicans, allege that the Hamilton County Republican Party through its Central Committee has tremendous power to determine who will be elected in Cincinnati. In fact, in their complaint they state that "[t]he Republican Party has been absolutely dominant in Hamilton County government dating back at least forty years, enjoying a virtual monopoly in most major county offices and most judicial seats during that period." Complaint at 4.

Additionally, the Plaintiffs allege that in order to be heard in Hamilton County, Ohio, or the United States, one must be in either the Democratic or Republican Party. The Plaintiffs further maintain that the two parties hold the only five seats on the Hamilton County Board of Elections, and thus, have complete power to choose what outside entity should tabulate the election results. Complaint at 5. Without citation of authority, the Plaintiffs claim that the judicial branch and the executive branch of the State of Ohio have found that the current computerized voting system lacks adequate safeguards. Complaint at 6.

On March 30, 1989, the Plaintiffs assert that they acted in accordance with the Hamilton County Republican Party Constitution and held a meeting whereby they amended the Republican Constitution. The amendment they allegedly enacted permits a secret ballot on any question upon a motion by one member of the Central Committee, which is seconded by three others. The Republican Party has not recognized this amendment, but the Plaintiffs allege it has been certified by the Secretary of State. Complaint at 9.

The Plaintiffs further allege irregularities in the 1990, 1992 and 1994 election of Central Committee officers and Executive Committee members. Specifically, in 1994 the Plaintiffs maintain that the Party failed to use a secret ballot when electing members, and elected members in such a way that they could not insure only "duly elected Central Committee members were voting on the floor, and it failed to conduct verifiable vote counts." Complaint at 11.

After adjournment of this meeting, one of the Platform Republicans approached the podium, stated that the entire meeting had been invalid due to violations of the Party Constitution, and recalled the meeting to order. A secret ballot was held and a different slate of Party officers and Executive Committee members was elected. The Platform Republicans then filed their list in accordance with Ohio Rev.Code §§ 3517.05 and 3517.06. The state Central Committee then decided that the original list of officers was valid, and denied recognition of the Platform Republicans list of committee officers. From this, the current dispute arises.

## STANDARD OF REVIEW

■ A motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6) must be viewed in the light most favorable to the party opposing the motion. *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir.1983). The court must accept as true all allegations in the well pleaded complaint under attack. *Id.* The court may grant the motion only "if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988); *Balderaz v. Porter,* 578 F.Supp. 1491, 1494 (S.D.Ohio 1983).

## DISCUSSION

As we begin our analysis, it is imperative that we proceed with caution and detail, because we are dealing in an area where judicial restraint is of the utmost importance. As the United States Supreme Court has previously emphasized in a political delegate case,

Judicial intervention in this area traditionally has been approached with great caution and restraint. It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-

party disputes as to which delegates shall be seated.

*O'Brien v. Brown,* 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972).

The Plaintiffs filed this case pursuant to 42 U.S.C. § 1983. In order to bring an action under 42 U.S.C. § 1983, the Plaintiffs must allege that the Defendants 1) acted under the color of state law and 2) deprived the Plaintiffs of some right or privilege secured by the constitution or laws of the United States. *Banchy v. Republican Party of Hamilton County,* 898 F.2d 1192, 1194 (6th Cir.1990); *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982). Thus, the threshold inquiry is whether a party acts under the color of state law when it elects its officers.

"In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required by the Fourteenth Amendment." *Kohn,* 457 U.S. at 838, 102 S.Ct. at 2769–70 (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966)). Therefore, in order for the Plaintiffs to survive the Defendants' 12(b)(6) motion to dismiss, they must first allege a set of facts that shows there was "state action."

The inquiry must begin by determining if there is a sufficiently close nexus between the *state* and the *challenged action* of the political party so that the action of the latter may be fairly treated as that of the state itself. *Jackson v. Metropolitan,* 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974). Three Supreme Court cases, *Jackson, Kohn* and *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), provide a framework within which we may analyze the issue of "state action." In order to elucidate this framework, this Court will examine each of those three cases.

In *Jackson,* the Plaintiff brought suit against a private utility company under 42 U.S.C. § 1983 when it terminated her electric service without notice, a hearing, or an opportunity to pay any amount found due. 419 U.S. at 347–48, 95 S.Ct. at 451–52. The utility company was highly regulated by the State of Pennsylvania. *Id.* at 346, 95 S.Ct. at 451. The Supreme Court stated that the fact the company is highly regulated and may have been granted monopoly status does not necessarily convert its actions to those of the state. *Id.* at 350–52, 95 S.Ct. at 453–54.

The Plaintiffs further argued that the utility performed an essential public service, and therefore, it was performing a "public function." A company, however, performs a "public function" only when it exerts powers exclusively reserved to the State. *Id.* at 352, 95 S.Ct. at 454. Pennsylvania courts had previously rejected the contention that a utility company was performing a "public function" and, in accord with those findings, the Supreme Court found that the utility company was not performing a "public function." *Id.* Finally, the Supreme Court found that the utility company and the State were not sufficiently intertwined to make the utility's acts "state action" even though the state authorized the utility's termination procedures. *Id.* at 354, 358, 95 S.Ct. at 455, 457.

In *Blum,* the Plaintiffs, Medicaid patients, challenged decisions of nursing homes that discharged or transferred patients without an opportunity to be heard. 457 U.S. 991, 995–97, 102 S.Ct. 2777, 2781–82. The nursing homes were reimbursed by the state for any costs associated with the Medicaid patients. *Id.* at 994, 102 S.Ct. at 2780–81. The Supreme Court held that funding and regulation of the nursing homes did not make the nursing homes' actions attributable to the state. *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789. The High Court reasoned that there was no coercion by the state nor was there a sufficiently close nexus between the state and the challenged procedures in order to make the discharge or transfer state action. *Id.* at 1004, 102 S.Ct. at 2785–86.

Finally, in *Kohn* a teacher brought suit against a private high school for firing her after she spoke out against school policies, alleging that the school fired her in violation of her First Amendment rights. *Kohn,* 457 U.S. at 834–35, 102 S.Ct. at 2767–68. Although the high school was private, it received most of its funding from public sources and was regulated by public authorities. Nevertheless, the Supreme Court held that "the school's receipt of public funds does

not make the discharge decisions acts of the State." *Id.* at 840, 102 S.Ct. at 2771. Furthermore, while a committee of the state had to validate the school's hiring decisions, such regulations were not "sufficient to make a decision to discharge, made by private management, state action." *Id.* at 842, 102 S.Ct. at 2771–72. In conclusion, the High Court stated that while there is no doubt the school is serving a public function by educating students, that alone does not make the entity's actions those of the state. *Id.*

■ These Supreme Court decisions indicate three criteria that a court may apply to determine if the action in question is attributable to the state. First, if the State has exercised "coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786 (citing *Jackson,* 419 U.S. at 353, 95 S.Ct. at 454–55). Second, when heavy regulation of the actor exists, there must be "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* at 1004, 102 S.Ct. at 2786. Finally, in the "public function" area there can be state action if the private group is serving a public function that has been traditionally "the *exclusive* prerogative of the state." *Kohn,* 457 U.S. at 842, 102 S.Ct. at 2772 (quoting *Jackson,* 419 U.S. at 353, 95 S.Ct. at 455). If none of these elements are present, there is no state action and this case must be dismissed.

■ The Plaintiffs first allege that the Republican Party of Ohio is empowered by Ohio Rev.Code § 3517.05 to "arbitrarily choose between one or more groups claiming leadership of the County Central Committee." Complaint, ¶ 21 (doc. 10). Specifically, the Plaintiffs allege that the Party conducted its election of officers in a manner that was unverifiable and in violation of its own constitution. Therefore, after the Party elections, the Plaintiffs attempted to recall the meeting and hold a new election, whereby they elected a new slate of officers. The Party then had two slates of officers, and pursuant to Ohio Rev.Code § 3517.05 the State Central Committee chose the first slate as the Party's officers. The Plaintiffs claim that the State's authorization of the State Central Committee's power to choose, makes the Committee's actions "state action."

■ We disagree with the Plaintiffs' contention that this authorization makes the Committee's acts those of the state. As noted in *Kohn* and *Blum,* regulation alone does not make the actions of the regulated party state action. *Kohn,* 457 U.S. at 841, 102 S.Ct. at 2771 ("[S]tate regulation, even if extensive and detailed, did not make a utility's action state action."); *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789 (funding and regulation of a private entity does not necessarily make that entity's actions "state action"). Moreover, the authorization to resolve internal party disputes does not make the Party and State intertwined, such that actions of the Party are "state action."

■ If the State were to put its weight on which faction the Party must choose then an issue of "state action" could exist. *See Jackson,* 419 U.S. at 357, 95 S.Ct. at 457 ("Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so "state action" for purposes of the Fourteenth Amendment."). The Plaintiffs, however, have presented no evidence that the State either overtly or covertly encouraged the choice of the Republican Party State Central Committee. Ohio Rev. Code § 3517.05 only authorizes a party to resolve internal disputes. Even without this statute, the Republican Party would have the right to choose between two competing factions as to which one will represent its Party. *See Eu v. San Francisco Democratic Central Committee,* 489 U.S. 214, 224, 109 S.Ct. 1013, 1020–21, 103 L.Ed.2d 271 (1989) ("[a] political party has a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences.") (internal citations omitted).

■ Therefore, if this Court intervened in this dispute, it would risk treading upon such rights. Similarly, this Court should not substitute its judgment for that of the Party.

The fact that a political party risks and often realizes internal friction does not justify intrusion by a court or state; "[p]resumably a party will be motivated by self-interest and not engage in acts or speech that run counter to its political success." *Id.* at 228, 109 S.Ct. at 1022. While it may not be politically expedient to alienate an important part of the party, that is within each party's prerogative.

Furthermore, it is essential to their member's constitutional rights of free association that political parties be able to resolve intra-party disputes on their own. *See Eu v. San Francisco Democratic Central Committee,* 489 U.S. 214, 224, 109 S.Ct. 1013, 1020–21, 103 L.Ed.2d 271 (1989) ("Freedom of Association means ... that a political party has the right to identify the people who constitute the association, and to select the standard bearer who best represents the party's ideologies and preferences.").[1] Therefore, the Party's choice in how to resolve its own disputes must be respected by this Court, even if that choice means that the Party conducts elections of its officers in a haphazard manner. For all of the reasons discussed above, these actions by the Republican Party cannot be construed as "state action," and consequently, this aspect of the Plaintiffs' claim is not cognizable.

Next, the Plaintiffs allege that Ohio Rev. Code § 305.02 empowers the County Central Committee to perform a public function by filing vacancies of county offices. The Sixth Circuit has already decided this exact issue in *Banchy v. Republican Party of Hamilton County,* 898 F.2d 1192, 1195 (6th Cir.1990). In *Banchy,* the Platform Republicans sued the Republican Party complaining that they were denied the opportunity to vote for their ward chairmen as provided for in the Republican Constitution. *Id.* at 1193. Rather than dispute the merits, the Republican Party volunteered to hold new elections. *Id.* at 1194. The Platform Republicans then proceeded to seek attorney's fees under 42 U.S.C. § 1988.

The Court of Appeals for the Sixth Circuit found that there was no "state action," and thus, the Plaintiffs could not collect attorney fees. The Court of Appeals also indicated that the Central Committee is elected by each precinct, and thus, election of different members is the best way to change their decisions. *See Id.* at 1194–95. It is presumed that each member represents his or her constituents' best interests within the Party, and thus, the people who are appointed to replace the vacancies are favored by the majority. This is the democratic process at work.

Furthermore, while some of the duties of the Central Committee, including replacing incumbents, may be interpreted as "state action", that in turn does not make all of its acts state action. *Id.* ("When engaging in party activities, such as electing ward chairmen, distinct from their official governmental duties, the members of the Central Committee do not continue to act under color of state law merely because they have some governmental duties.") The Plaintiffs are complaining about the election of internal officers in this case. While some of the actions they take when elected, may be interpreted as "state action," that does not make everything they do nor the process of their election "state action." More specifically, the fact that the Central Committee fills vacancies has nothing to do with the Plaintiffs' complaint of alleged improprieties in the election of Party officers. Intra-party elections of officers is not "state action." *Banchy,* 898 F.2d at 1196 (quoting *Lynch v. Torquato,* 343 F.2d 370, 372 (3d Cir.1965) ("the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action."); *California Republican Party v. Mercier,* 652 F.Supp. 928, 934 (C.D.Cal.1986) ("the filling of [a party office] is not state action or under color of state law")). Additionally, in order

---

**1.** After the Supreme Court's decision in *Eu,* it remains questionable whether the State can prescribe how a political party resolves its internal disputes. As the Supreme Court stated, "[a] state may enact laws to prevent the disruption of the political parties from without, but not, as in this case, laws to prevent the parties from taking internal steps affecting their own process for selection of candidates." *Eu,* 489 U.S. at 227, 109 S.Ct. at 1022; *see also Banchy v. Republican Party of Hamilton County,* 898 F.2d 1192, 1195 (6th Cir.1990).

to find "state action" there must be a sufficient nexus between the alleged act and the state. *Jackson, supra,* 419 U.S. at 351, 95 S.Ct. at 453–54. The officers' day to day duties of running the Republican Party do not meet this test.

 In their complaint the Plaintiffs also allege that "[t]he Hamilton County Republican Party routinely engages *off duty* City of Cincinnati police officers and/or Hamilton County Sheriff's deputies to provide security and/or threaten to intervene in this political dispute." Complaint, ¶ 23 (emphasis added). The fact that a political party uses a security force does not make its actions "state action." People often use security personnel at their functions to keep things calm and civilized. The fact that they were off duty police officers exemplifies that they are a security force. Even if they were on duty, however, the Republican Party or anyone else could call them to expel trespassers, stop crimes or prevent disturbances. That in fact is a police officer's job.[2] Calling the police or a security force to a function does not make that function "state action."

 Additionally, the Plaintiffs claim that "the Hamilton County Republican Party's shared control of the Hamilton County Board of Elections constitutes an intimate nexus between the Party and the County government." Complaint, ¶ 25. More specifically, they assert that when absentee ballots were sent out for the Republican primary, enclosed was an endorsement of a particular candidate. Simply alleging that the Republican Party sends out fliers endorsing candidates does not tie the state to the action. The Supreme Court has repeatedly held that the inquiry must be whether a sufficiently close nexus exists between the *state* and the *challenged action,* not the particular actor. *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453–54. In this case, the Plaintiffs fail to allege that the State "is intimately involved in the challenged private conduct to

become attributable to the State for purposes of 1983 action," *Bier v. Fleming,* 717 F.2d 308, 311 (6th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984), because they have alleged only that the Republican Party has endorsed candidates in the primaries and nothing more.

 Assuming, however, that the State authorizes parties to send out endorsements of candidates along with the absentee ballot, this Court would be inclined to find "state action."[3] Even if there was "state action," however, we cannot find that it resulted in a violation of the Plaintiffs' rights. The Supreme Court has held that a political party has a First Amendment right to endorse candidates in its primaries, when it feels the candidate is worthy of election. *Eu,* 489 U.S. at 224, 109 S.Ct. at 1020 ("Barring political parties from endorsing and opposing candidates not only burdens their freedom of speech but also infringes upon their freedom of association."). Hence, allowing parties to send out endorsements along with the absentee ballot is not unconstitutional. Nowhere do the Plaintiffs allege that they were denied the opportunity to send out an endorsement of their candidates. As long as everyone is given access to the mailings and the State is not choosing which messages can be sent out, there is no constitutional violation. Accordingly, the Plaintiffs have failed to state an actionable First Amendment violation.

Finally, the Plaintiffs alleged that "the Hamilton County Republican Party has effectively monopolized the Hamilton County Government for the past forty years, so that election of the Hamilton County Republican Party is tantamount to the election of the Hamilton County Government." Complaint, ¶ 24. In their allegations, they analogize this case to the Supreme Court's White Primary Cases. *See Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (holding that a party which chooses the eventual county representative in their primary cannot deny African Americans the opportunity to vote

---

2. Even if the police officers came to a meeting and violated a person's civil rights, that would not be "state action" on behalf of the party. Of course, the police officer's actions would be "state action" under § 1983, but that would not automatically make the Republican Party's meeting and the Party's actions "state action."

3. The Plaintiffs, however, have failed to allege sufficient facts for this Court to find that the State did in fact allow the Republican Party to send out these fliers.

for or against that person in the only election that matters); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (holding that a party can not deny African Americans the opportunity to vote in primaries); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (striking down a regulation that gave the party the power to describe voting qualifications, which led to denial of opportunity to vote for African Americans); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) (striking down a statute that barred African Americans from voting).

The Plaintiffs place most of their emphasis on the High Court's splintered decision in *Terry v. Adams.* In *Terry,* the High Court held that the 'Jaybird Association,' a private, all-white political club that controlled the Texas Democratic Party, so dominated the election process through its private primary that African–Americans were effectively disenfranchised. 345 U.S. at 463–66, 73 S.Ct. at 810–12. This disenfranchisement in the primary process was effectively total disenfranchisement because election of a candidate in the primary was a fortiori election of the eventual representative of the county. *Id.* at 469, 73 S.Ct. at 813. Although the High Court attributed the Jaybirds' actions to the state, the eight-member majority could reach no consensus on the basis for the finding of state action. Justice Black, however, announced the most important part of the case: "[t]he Jaybird primary [had] become an integral part, indeed the only effective part of the elective process that determines who shall rule and govern in the county." *Id.* at 469, 73 S.Ct. at 813.

As, the Sixth Circuit has already held the White Primary Cases are "easily distinguishable" from actions such as these. *Banchy,* 898 F.2d at 1196. Unlike the Democratic candidates in *Terry,* Hamilton County Republican candidates still face a tough challenge from the Democrats before being elected.[4] Therefore, the Republican Primary does not automatically dictate who will eventually win the election.

Even if there was "state action", the Plaintiffs have not alleged they were denied the right to vote. In fact, they voted and lost. This is substantially different from not being allowed to vote at all, as was the fate of the African Americans in the White Primary Cases. In *Smith v. Allwright, supra,* the Supreme Court held that since primaries were an integral part of the election process, African–Americans must be allowed to vote in it in order to secure their constitutional right to ballot access. *Smith,* 321 U.S. at 664–65, 64 S.Ct. at 765. Unlike the disenfranchised voters in the White Primary Cases, the Platform Republicans have not been denied the opportunity to vote within their Party or at the elections. The fact that they may have lost against the popular current of the Party is not something this Court can or should rectify. The proper forum to decide the Platform Republican's case is the crucible of public debate. Should their ideas withstand such examination, a remedy far beyond the power of this Court is assured.

In conclusion, the Plaintiffs have failed to show: 1) that a sufficiently close nexus exists between the State and the challenged actions; 2) that the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state; or 3) that the Republican Party is serving a public function that has been traditionally the exclusive prerogative of the state. Even in the instances where "state action" may exist, the Plaintiffs have failed to show that their rights have been violated. Consequently, this case should be dismissed.

## CONCLUSION

Accordingly, we hereby GRANT Defendants' motions to dismiss (docs. 11 and 12), and thus, ORDER the case to be dismissed.

SO ORDERED.

---

4. In oral argument, the Plaintiffs asked this Court to take judicial notice of the fact that there are two parties in Hamilton County. Hamilton County, however, continues to be unique in that a third-party called the Charterites has had some

success in past elections. Whether there are two, three or more choices, however, this case is distinguishable from *Terry* where there was only one.