**AMERICAN STRUCTURES, INC., James H. Graves and Louis Tabor**

v.

**FIDELITY & DEPOSIT COMPANY OF MARYLAND, United States Fidelity & Guaranty Company, Aetna Casualty & Surety Company.**

Civ. A. No. 81–0537.

United States District Court, E. D. Pennsylvania.

Aug. 19, 1982.

---

1. The defendants suggest that there are two possible statute of limitations that govern vacation of arbitration awards that may apply under the facts of this case because a new collective bargaining agreement was entered into by the parties on July 26, 1981. However either statute, Mo.Rev. § 435.120 or § 435.405, would bar the plaintiff's suit. Therefore it is unnecessary to decide which statute applies.

Lawrence D. Berger, and Carl W. Hittinger, Philadelphia, Pa., for plaintiffs.

Daniel Mungall, Jr., Philadelphia, Pa., for Fidelity & Deposit Co. of Maryland.

Bruce L. Phillips, Philadelphia, Pa., for United States Fidelity & Guaranty Co.

John G. Harkins, Jr., and Deborah F. Cohen, Philadelphia, Pa., for Aetna Casualty & Surety Co.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This antitrust action was brought by plaintiffs, American Structures, Inc. ("American") and two of its principal officers and shareholders, James H. Graves and Louis C. Tabor, against three defendant surety companies, the Fidelity and Deposit Company of Maryland ("F&D"), the United States Fidelity & Guaranty Company ("USF&G") and Aetna Casualty and Surety Company ("Aetna"). Plaintiffs contend that defendant surety companies conspired to boycott the plaintiffs in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by denying American bonding for certain heavy construction projects. Second, plaintiffs contend that defendant surety companies acted in violation of their civil rights by refusing to provide bonding for bids by American on certain public contracts in alleged violation of 42 U.S.C. § 1983. Finally, plaintiffs contend that defendants have acted in violation of state law and have included various pendent state law claims in their complaint. Presently before the Court are defendants' motions for summary judgment. For the reasons which follow, defendants' motions will be granted.

### I. *Facts*

American, a heavy construction contractor, was founded in 1964. American specializes in tunneling and underground construction. James Graves and Louis Tabor are its two principal officers and two of its principal shareholders. From 1971 until 1976, American secured bid, payment and performance bonds from F&D with respect to various government contracts and was never refused bonding by that surety.

In 1974, American was awarded a $5,348,-276.00 contract by the City of Baltimore to construct an interstate highway drainage tunnel. F&D provided American with bonding on this project. American encountered unanticipated soil conditions which greatly increased its costs. American continued to work on this project at the original price but attempted to negotiate a price adjustment under the "changed conditions" clause of the contract. The City of Baltimore refused to compensate American for its increased costs and suit was filed by American in September, 1975. In May of 1976, American stopped work on the project.

On September 16, 1976, American, F&D, and the First National Bank of St. Paul ("Bank"), entered into an agreement in an attempt to keep American financially secure during the pendency of the Baltimore litigation. Under this agreement, the Bank agreed to increase American's available borrowings from $1.8 million to $4 million, of which $800,000.00 would be covered by a guarantee by the surety, F&D. The Bank took a perfected first lien on all of the equipment owned by American and a perfected first lien on 79.8 percent of the outstanding shares of American stock, which was owned in equal proportions by Louis G. Tabor and James H. Graves, as collateral for the increased borrowings and other indebtedness owed by American. Under the agreement, F&D agreed to pay all of the outstanding labor and material claims with respect to the Baltimore project and received an assignment of the unpaid contract balance in return. In addition, F&D agreed to provide a continuing line of bonding credit as follows:

B. *Continuing Line of Bonding Credit.* *Surety agrees to accept applications for surety bonds from American and to execute or decline each bond for which appli-cation is made based upon then-current underwriting conditions.* Surety recognizes American's requirement for continued volume of work to meet its operating expenses. Surety and American both recognize that the acquisition of additional work will best be obtained and prosecuted through American participation in suitable joint venture arrangements on major projects. *Surety assures that it will provide bonding credit on these projects where Surety and American are mutually satisfied with the joint venture meeting underwriting requirements and conditions. Surety will consider such specific jobs with American as sole bidder but without commitment or any contingencies to this agreement with respect to providing bonds on such projects.*

Agreement of September 16, 1976, Section II, paragraph B (emphasis added).

Pursuant to the September 16, 1976 agreement, the Bank increased American's available borrowings from $1.8 million to $4 million. The money was used by American to maintain its office, retain its personnel, and carry its overhead expenses from September, 1976 to December, 1978. During this time period, however, F&D refused to bond American on certain heavy construction joint venture projects, but allowed bonding for certain subcontracts or work to be performed by American under management agreements. *See Deposition of James H. Graves,* at 41–47.

In December, 1978, the Baltimore litigation was terminated and settled. Immediately thereafter, American, F&D, and the Bank entered into a settlement agreement in which the funds to be paid by the City of Baltimore were assigned to the Bank to reduce the amount of American's indebtedness. In addition, F&D agreed to pay the sum of $100,000.00 to the Bank to release F&D from its guarantee of the $800,000.00 line of credit extended to American by the Bank following the September 16, 1976

agreement. The $100,000.00 payment was credited to the indebtedness owed by American to the Bank.

On January 4, 1979, a mutual release and settlement was entered into by Baltimore, American, F&D, and the Bank. Baltimore paid $3.5 million to the Bank in settlement of all of American's claims. The dollar amount of the settlement was not disclosed in the general release because of a confidentiality provision contained in that agreement. Nevertheless, it was provided that disclosure of the settlement terms could be made

... to the extent that Louis G. Tabor (with respect to American Structures, Inc.), Robert D. Carnaghan (Vice-President of Fidelity and Deposit Company or any successor in the position he now holds), Edward Wallerman (with respect to the First National Bank of St. Paul), and Ambrose T. Hartman (on behalf of the Mayor and City Council) *may deem necessary in the ordinary course of the business of their parties.*

*Mutual General Release and Settlement of All Claims,* at 4 (January 4, 1979) (emphasis added).

Following the termination of the Baltimore litigation, F&D claimed losses as a result of its dealings with plaintiffs in excess of $200,000.00: $100,000.00 paid to the Bank, $35,000.00 in unreimbursed payments to American's subcontractors, and $83,-000.00 in legal fees and expenses for the litigation with Baltimore. F&D reported its $100,000.00 payment to the Bank as a loss to the Excess & Casualty Reinsurance Association ("ECRA"), a consortium of insurance companies which reinsured surety risks. From this date forward, plaintiffs contended that a conspiracy was entered into by defendant surety companies to boycott plaintiffs.

## II. *Antitrust Conspiracy Claim*

Section 1 of the Sherman Act outlaws "[e]very contract, combination ..., or conspiracy in restraint of trade ..." Plaintiffs contend that a conspiracy, beginning as early as January, 1979, was entered into

by defendants F&D, USF&G and Aetna to boycott and refuse to issue surety bonds or a line of bonding credit to American for any heavy construction project or to any contractor with whom American did business in order to destroy the business of American. Plaintiffs conceded at oral argument that they have no direct evidence of a conspiracy to boycott by defendants. Plaintiffs contend, however, that concerted action in violation of Section 1 of the Sherman Act can be inferred from the evidence of parallel business behavior by defendant surety companies beginning in January, 1979, to the date of the complaint, February 11, 1981.

### A.

■ Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). "Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However,

> [w]hile we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial *notwithstanding the absence of any significant probative evidence tending to support the complaint.*

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968) (emphasis added). Summary judgment may be awarded in antitrust cases "where plaintiffs, after having engaged in extensive discovery, fail to produce 'significant probative evidence' in support of the allegations in their complaint." *Zenith Radio v. Matsushita Electrical Industrial Co.*, 513 F.Supp. 1100, 1140

(E.D.Pa.1981) (citing *First National Bank of Arizona v. Cities Service Co., supra*). Although summary judgment may be characterized as "a drastic remedy," *see Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981), it may be appropriately awarded where needless expenditures of judicial resources and time can be avoided because there are, in essence, no genuine issues of material fact to be tried before a jury. *Zweig v. Hearst Corporation*, 521 F.2d 1129, 1135–1136 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). *See also Zenith Radio v. Matsushita Electrical Industrial Co.*, 513 F.Supp. 1100, 1139–1144 (E.D.Pa. 1981) and cases cited therein.

### B.

■ Defendant surety companies argue that plaintiffs have failed to produce any "significant probative evidence" that defendants entered into a conspiracy to boycott plaintiffs. In order to establish liability where there is no direct evidence of conspiracy but evidence of parallel business behavior, the plaintiffs must establish "two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests, . . . and (2) satisfactory demonstration of a motivation to enter an agreement . . ." *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 894 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (quoting *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975). Plaintiffs contend that defendants acted in contradiction of their own economic interests by refusing to provide bonding to a viable contractor such as American. Second, plaintiffs contend that defendants' motivation to boycott plaintiffs was to deter future contractors from causing losses or failing to reimburse their surety companies for losses caused by a contractor's default on a construction obligation.

### C.

■ Aetna has had only two contacts with American during the relevant time

period of the alleged conspiracy. These contacts do not support American's claim of a conspiracy to boycott the plaintiffs.

First, in February, 1979, Dick Steers, President of J. Rich Steers, set up a luncheon meeting in New York with James H. Graves of American, Robert T. Stites, Manager of Aetna's New York City Bond Department, and Thomas DeLuca, and Aetna senior bond representative in New York, to discuss possible bonding for American in regard to potential joint venture projects with Steers in the Chicago area. During the course of this luncheon, Graves admitted to certain past bonding problems but submitted American's 1979 financial statement for review. Following this meeting, Stites and DeLuca came to the tentative conclusion that bonding would be denied because "[t]he bank had him pretty well tied up." Deposition of Thomas DeLuca, at 36. Stites and DeLuca noted that Note E to the 1979 financial statement, entitled "Settlement of Baltimore Contract," expressly set forth the terms of the Baltimore settlement and the fact that the outstanding bank loan "is collateralized by substantially all of the company's assets and is personally guaranteed by the two principal shareholders of the company." Financial Statement of American Structures, Inc. for January 31, 1980, Note E, at 7. In March, 1979, further information was provided to Aetna. Nevertheless, American's application for bonding was denied. Letter of March 27, 1979, Robert T. Stites to James H. Graves.

Second, in the summer of 1979, American contacted Mr. Leonard Bullock, a surety agent with E. H. Crump and Company in Memphis, Tennessee, in the hopes that Bullock could obtain bonding for American for a job for the Metropolitan Sanitary Sewer District of Chicago. Bullock approached several bonding companies including the Hartford, American International, and Aetna, all of which refused to bond American. With respect to this latter contact, Aetna notified American in August, 1979, that Aetna's position with American's financial situation had not changed.

■ Plaintiffs' only evidence in support of their contention that Aetna entered into a conspiracy to boycott plaintiffs is the fact of the denial of bonding to American on two separate occasions, February-March, 1979, and August, 1979, and the fact that Aetna had access to information about F&D's claimed loss for which F&D sought reimbursement because Aetna was a member of ECRA. Plaintiffs contend that, under these circumstances, the almost immediate rejection of American for bonding by Aetna officials based upon their review of American's financial report for January 31, 1980, creates genuine issues of material fact of Aetna's entry into the alleged conspiracy. The Court does not agree. First, Aetna has submitted uncontroverted evidence that it independently reviewed the financial statements of American and that it denied bonding because of its perception that American had an adverse financial position. Deposition of Thomas DeLuca, at 36. The January 31, 1980 financial report expressly stated that all of the company's assets were tied up as collateral for the indebtedness owed to the Bank. Second, mere membership in a trade association with the opportunity to conspire cannot, by itself, support the inference that a conspiracy existed. *Tose v. First Pennsylvania Bank, N.A.*, *supra*, 648 F.2d at 894. There is no evidence that Aetna communicated with any of the other alleged co-conspirators with respect to American. Under the present state of the record, there is no probative evidence that Aetna entered into a conspiracy to boycott plaintiffs because of a motive to punish American or to deter other contractors from causing a loss to their sureties, and Aetna's motion for summary judgment must be granted.

### D.

USF&G has had only three contacts with American during the relevant time period of the alleged conspiracy. These contacts also do not support American's claim of an alleged conspiracy.

On January 18, 1979, Richard M. Keehan, Jr., of the Chicago branch office, requested

Michael P. Hammond, the Assistant Superintendent of the Mid-Western Division, to contact F&D and to inquire into the status of American with respect to F&D's claims department. At that time, Pora Construction Company, a client of USF&G, had expressed an interest in working with American on certain tunnel construction projects. Pora was primarily a general building contractor which first expanded its business operation into the field of tunnel construction in and around 1977. Mr. Hammond contacted F&D on January 19, 1979, and was told by F&D the nature and terms of the Baltimore settlement and that F&D had an outstanding claim for the $100,000.00 paid by F&D to the Bank for the release of the guarantee and $38,000.00 on other bonds or claims. Affidavit of Michael P. Hammond, Exhibit C.

In March, 1979, Pora requested bonding for an estimated $7,000,000.00 to $8,000,000.00 dollar contract involving tunnel construction for the Metropolitan Sanitary Sewer District of Chicago in which the drilling of the tunnel would be subcontracted to American. Mr. Hammond noted his underwriting analysis with respect to the bonding request on the face of the Telex message received from the Chicago branch office which requested authorization with notations indicating that the bond request would be denied because of the nature and size of the project and the lack of experience by Pora with respect to tunnel construction. Affidavit of Michael P. Hammond, Exhibit C. Hammond also noted on the Telex beneath the name "American Structures," the words "can't be bonded." Mr. Hammond admits that he had prior knowledge of the financial difficulties of American by reason of the January, 1979 communication with F&D, but states that his decision to decline Pora's request for bonding was based solely upon his underwriting judgment with respect to Pora and its inexperience with tunnel construction. Affidavit of Michael P. Hammond, paragraph 8.

In March, 1980, USF&G had its third contact with American. On that occasion, Pora requested authorization and bonding for a $4 million dollar construction contract with the Metropolitan Sanitary Sewer District of Chicago for the excavation of an open cut sewer and construction of a deep shaft in which American would be a "silent joint venture partner" to perform the deep shaft portion of the contract. Robert J. Feehery, the Superintendent of the Bond Department of the Chicago branch office, noted in his underwriting analysis that American "has no surety" and that American had only a net worth of $465,603.00 as of January 31, 1979. Affidavit of Robert J. Feehery, Exhibit C. Mr. Feehery requested further information from Willard R. Holley, the then Superintendent of the Mid-Western Division, with respect to American. Affidavit of Robert J. Feehery, Exhibit A. The home office conditionally approved Pora's request for bond authorization with respect to the Chicago project on the condition that the drilling contractor, whether American or any other contractor who would perform the drilling for the deep shaft portion, obtain independent bonding. American was unable to obtain independent bonding.

The evidence is uncontroverted that tunnel construction is considered to be generally one of the most hazardous types of construction activity and that various factors including the size of the project, the experience of the contractor, and the net worth of the contractor's business, must be considered by a bond underwriter. In the present case, the evidence is uncontroverted that Pora had little or no experience in tunnel construction and that it needed to subcontract any expected drilling work to other contractors because of its inexperience. American's financial statement of January 31, 1979, readily demonstrates that American's assets were restricted as collateral for the loans and lines of credit extended by the Bank. There is no evidence of any motive by USF&G to enter a conspiracy with F&D to boycott the plaintiffs. Rather, the evidence is uncontroverted that USF&G based its decisions solely upon its own perception of valid business reasons and that its underwriting analysis was

based upon its reluctance to furnish bonding to Pora for tunnel construction work because of Pora's little or no experience with that type of construction activity. *See, e.g., Tose v. First Pennsylvania Bank, N.A., supra,* 648 F.2d at 895 ("A business's refusal to enter a transaction, even a transaction with potential for a substantial profit, cannot support an inference that it acted in contradiction of its own economic interests in the face of substantial unrebutted and unimpeached evidence that its refusal was consistent with its own best interests."); *Venzie Corp. v. United States Mineral Prod. Co., Inc., supra,* 521 F.2d at 1314–1315. Plaintiffs' contention that USF&G conspired with other surety companies to boycott plaintiffs is founded upon pure speculation. There are no objective facts or reasonable inferences which can be drawn in support of plaintiffs' theory. *See Tose v. First Pennsylvania Bank, N.A., supra,* 648 F.2d at 895. For these reasons, after a full review of the present record, the Court finds that there is no probative evidence in support of plaintiffs' theory that USF&G entered into a conspiracy to boycott plaintiffs and, therefore, USF&G's motion for summary judgment will be granted.

### E.

F&D, as noted earlier, provided bid, payment and performance bonds for American from 1971 to 1976. Following the settlement of the Baltimore litigation, F&D refused to provide bonding to American with respect to a number of projects. Plaintiffs present their strongest evidence against F&D. However, Section 1 of the Sherman Act "does not prohibit unilateral activity . . . there must be proof of more than solitary conduct, there must be proof of concerted action." *Tose v. First Pennsylvania Bank, N.A., supra,* 648 F.2d at 893. Summary judgment must also be awarded to F&D on the antitrust conspiracy claim because there is no probative evidence of an agreement between the named defendants, F&D, USF&G, and Aetna, to boycott the plaintiffs. There is no evidence within the present record of " 'a unity of purpose or a common design and understanding, or a

meeting of the minds in an unlawful arrangement' " between any of the alleged co-conspirators. *See Tose v. First Pennsylvania Bank, N.A., supra,* 648 F.2d at 893 (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). For these reasons, F&D's motion for summary judgment will be granted.

### III. *Civil Rights Claim*

Plaintiffs assert that defendant surety companies have individually and in concert denied the plaintiffs of their civil rights because of their refusal to provide bonding with respect to public contracts in violation of 42 U.S.C. § 1983. Section 1983 provides a cause of action against any party who "under color of" state law deprives another of rights or privileges secured by the Constitution or federal law. A claim for relief under 42 U.S.C. § 1983 must embody at least two elements: (1) a deprivation of a right "secured by the Constitution and the laws" of the United States, and (2) deprivation of a right "under color of" state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 (1978). Defendant surety companies contend that they are entitled to summary judgment because there is no "state action."

Surety companies are licensed and regulated by various state governments. Bid, performance and payment bonds are usually required with respect to construction of public projects in order to protect against any potential defaults by the builder contractors and to assure completion of the project. Nevertheless, surety companies are private insurance industry entities subject only to public regulation.

Plaintiffs present two theories in support of a finding of "state action." First, plaintiffs contend that surety companies perform a "public function" by their guarantee of the construction of public work projects. Plaintiffs maintain that the various governmental authorities, which require contractors to be bonded, delegate to the surety companies the public function of

selecting and determining which contractors have sufficient responsibility and abilities to work on necessary public construction projects. Without bonding, plaintiffs argue, a contractor cannot bid on a particular public construction project or work on that project. The relevant test for determining state action under the public function concept is whether "the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn,* —— U.S. ——, ——, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982). Moreover, "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Rendell-Baker v. Kohn, supra,* —— U.S. at ——, 102 S.Ct. at 2772. In the present case, private surety companies provide a valuable service by providing bid, payment and performance bonds to help guarantee the construction of public works. However, under no circumstances do surety companies undertake the construction of public works or render decisions which public works are to be constructed for the benefit of the public. For these reasons, the role of surety companies in the public works area is rather limited and does not rise to the level of the performance of a public function which was formerly "the *exclusive* prerogative of the State." *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157–161, 98 S.Ct. 1729, 1733–1736 (1978) (limited nature of public function exception).

Second, plaintiffs propose to find "state action" under the "close-nexus" test. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1975). The relevant test is as follows:

> ... the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action ... so that the action of the latter may be fairly treated as that of the State itself, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 [95 S.Ct. 449, 453, 42 L.Ed.2d 477] (1975), citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176 [92 S.Ct. 1965, 1973, 32 L.Ed.2d 627] (1972), or whether the State has so far insinuated itself into a position of interdependence with [the

defendants] that it must be recognized as a joint participant in the challenged activity. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725 [81 S.Ct. 856, 861, 6 L.Ed.2d 45] (1961).

*Bethel v. Jendoco Const. Corp.,* 570 F.2d 1168, 1176 (3d Cir. 1978). In *Bethel v. Jendoco Const. Corp., supra,* the Third Circuit held that discrimination practiced by contractors receiving large amounts of public funds for the construction of government projects was not actionable under 42 U.S.C. § 1983 because of the absence of state action. In the present case, plaintiffs note the fact that surety companies are licensed and regulated by the states and that surety bonds are essential in the construction of public works. Nevertheless, "[t]he mere fact that a business is subject to regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Blum v. Yaretsky,* —— U.S. ——, ——, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1975)). The role of the surety companies is extremely limited with respect to the construction of public work projects and there is no sufficiently close nexus between the awarding of contracts by local governmental authorities to the lowest bidders and the decisions of surety companies to provide bonding to contractors wishing to submit bids on publicly authorized construction contracts. Surety companies provide a valuable service to local governmental authorities. However, a position of interdependence does not exist so as to confer state action on the decisions of surety companies whether or not to provide bonding to certain contractors. For these reasons, defendants' motion for summary judgment on the civil rights claim under 42 U.S.C. § 1983 must be granted.

## IV. *Pendent State Law Claims*

Counts III through VI of plaintiffs' complaint assert various pendent state law claims against all three defendant surety companies, F&D, USF&G, and Aetna.

**1030**

Counts VII through XI assert additional pendent state law claims against F&D. "Pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Many of the state law claims arise from plaintiffs' contentions that defendants conspired to boycott plaintiffs, *see* Counts IV–VI, while others are based upon theories of breach of contract, business and personal libel, and tortious interference with contractual and business relationships. *See* Counts III, VII–XI. The Court has awarded summary judgment to defendants on the two principal federal law claims—the antitrust and civil rights claims. Due to the dismissal of the federal law claims prior to trial, the Court finds that it would be inappropriate, under all the facts and circumstances of the present case, to hear the state law claims which are best left to be decided in state court. For these reasons, the pendent state law claims will be dismissed without prejudice. *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139; *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir. 1976). *See also Weaver v. Marine Bank,* 683 F.2d 744 (3d Cir. June 30, 1982).

An appropriate Order will be entered.

### ORDER

AND NOW, TO WIT, this 19th day of August, 1982, for the reasons stated in the foregoing Memorandum, IT IS ORDERED as follows:

1. Defendants' motion for summary judgment against plaintiffs on Count I of plaintiffs' complaint is hereby *granted* and judgment is *entered* in favor of defendants and against plaintiffs.

2. Defendants' motion for summary judgment against plaintiffs on Count II of plaintiffs' complaint is hereby *granted* and judgment is *entered* in favor of defendants and against plaintiffs.

3. Counts III–XI are *dismissed without prejudice* because there are no federal questions left to be tried.