**NEW WAYS MINISTRY, et al., Plaintiffs,**

v.

**NATIONAL 4–H COUNCIL, et al., Defendants.**

Civ. A. No. 81–2711.

United States District Court, District of Columbia.

Aug. 31, 1982.

Ronald E. Bogard, Washington, D. C., for plaintiffs.

Norman A. Sugarman, Lee T. Ellis, Jr., Douglas K. Spaulding, Washington, D. C., for defendants Nat. 4–H Council and Grant A. Shrum.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this action, the plaintiffs, an organization of Catholic clergy named the New Ways Ministry and its co-directors Sister Jeannine Gramick ("the Ministry"), claim that the National 4–H Council ("the Council") violated the First and Fifth Amendments to the Constitution when it denied the Ministry the use of Council facilities for a conference in November 1981. The plaintiffs had sought to hold the "First National Conference on Homosexuality and the Catholic Church" at the Council's National 4–H Center ("the Center") in Chevy Chase, Maryland. Named as defendants are the Council, its director, and officials at the United States Department of Agriculture ("USDA").[1] The plaintiffs seek declaratory and monetary relief for the alleged violation of their constitutional rights.[2]

On November 20, 1981, plaintiffs' motions for a temporary restraining order and a preliminary injunction were denied. Since then discovery has been completed and the parties have filed cross-motions for summary judgment.

The central question presented in this lawsuit is whether the defendants, in denying the Ministry's application for use of the Center, acted under color of federal law.[3] For the reasons stated below, this Court finds that the Council did not act under color of federal law and therefore grants the defendants' motions for summary judgment.

### Background

The material facts are uncontested and are briefly stated. The Ministry is a non-profit corporation devoted to the concerns of homosexuals within the Catholic Church. The organization planned a national conference to be held on November 20–22, 1981.

---

1. The individual defendants are Grant A. Shrum, Executive Vice President of the Council; John R. Block, Secretary of Agriculture; and Mary Nell Greenwood, Administrator of the USDA's Federal Extension Service.

2. The monetary relief sought by the Ministry totals approximately $24,000, of which $16,000 is attorneys' fees associated with this litigation. The remaining alleged damages are the increased costs of holding their conference at an alternate location.

3. The defendants also argue that this action is moot and that venue is improper before this Court. Those claims are properly rejected. The action is not moot because of the money damages claim. *See, e.g., Caldwell v. Craighead,* 432 F.2d 213, 219 (6th Cir. 1970). Venue is appropriate in this Court because of the alleged cooperation of the federal and private officials in the decision to deny the Ministry's application for use of the conference facilities.

The National 4–H Center, operated by the Council in nearby Maryland, maintains meeting and lodging facilities. Those facilities are made available to organizations involved in programs of the Cooperative Extension Service of the USDA. The Center may also be used for conferences by groups "which relate to the work and mission of the Cooperative Extension Service."[4]

In early October 1981, Sister Gramick inquired at the Center about the possibility of its use for the planned conference. She was told that space was available on the requested dates but that a written application would be required. Sister Gramick complied. The Center's staff then requested more information on the group's purpose. Sister Gramick responded by submitting two informational brochures, which describe the group's purpose as follows:

> To provide basic and solid information regarding homosexuality from the perspective of sociology, moral, pastoral and feminist theology, religious life and celibacy for national and diocesan Catholic leadership.[5]

On November 3, 1981, the Council informed Sister Gramick that the application had not been approved. Don Henderson, the Council's Director of Program Operations, wrote Sister Gramick that the Ministry's proposed use of the Center did "not appear to meet the [Cooperative Extension Service] guidelines for use of the Center."[6] One week later, the Ministry applied for temporary injunctive relief. After a hearing, the application was denied. A motion to dismiss filed by the Council was denied on December 16, 1981. The cross-motions for summary judgment then followed.

### Legal Analysis

#### A.

It is fundamental that the First and Fifth Amendments, which the Ministry asserts were violated by the defendants, do not apply to acts of private persons or entities. *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883); *Rendell-Baker v. Kohn*, —— U.S. ——, ——, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). The Ministry argues that the decision of the Council to deny its application constituted "state action" and is therefore subject to constitutional limitations. Its argument principally rests on two theories. First, the Ministry asserts that there exists a "symbiotic relationship" between the state and the Council similar to the relationship in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (refusal of a restaurant located in a public parking garage to serve blacks constituted state action). Second, the Ministry asserts that the Council exercises a "public function," i.e., exercising powers that are "traditionally the exclusive prerogative of the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974) (electric company is not bound to observe procedural due process in terminating service notwithstanding the government's delegation of monopoly power).

Both the "symbiotic relationship" and the "public function" theories of state action were extensively examined in two recent Supreme Court cases, *Rendell-Baker*, —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418, and *Blum v. Yaretsky*, —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). They warrant a brief discussion. In *Blum*, a class of Medicaid nursing home patients challenged decisions by the homes to discharge or transfer them without notice or an opportunity for a hearing. The nursing homes were directly reimbursed by the state for the reasonable cost of health care services. Federal regulations required that a committee of physicians at each home periodically assess whether each patient

---

**4.** Aff. of Grant A. Shrum (Nov. 11, 1981) at ¶ 14.

**5.** Exhibit A, Plaintiff's Motion for Temporary Restraining Order (Nov. 10, 1981).

**6.** Exhibit A, Plaintiff's Motion for Summary Judgment (Dec. 24, 1981).

was receiving the appropriate level of care. If the committee determined that the patient should be discharged or transferred to a different level of care, it notified the state agency responsible for administering Medicaid assistance. The agency then adjusted the assistance accordingly.

The Supreme Court, reversing the lower courts, held that decisions of the committee to lower the patients' level of care did not involve state action. The Court reasoned that the state merely "responded" to the nursing homes' decisions by adjusting the benefits, and such a response did not transform the "independent" decision of the nursing homes' committees into state action. The extensive federal regulation and funding of the nursing homes did not require a contrary finding. The Court established a rigid test for finding state action: "[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." —— U.S. at ——, 102 S.Ct. at 2786 (emphasis in original).

A similar conclusion was reached in *Rendell-Baker*. There, the Court examined whether the action of private school officials in dismissing teachers and other staff persons from their jobs at the school constituted state action because of the close relationship between the school and state authorities. Nearly all of the school's students were sent there by city or state officials, who paid for the students' education. The school also received funds from a number of other state and federal agencies. Government funding totaled as much as 99 percent of the school's operating budget in one year. Extensive regulations concerning matters ranging from record-keeping to student-teacher ratios guided the administration of the school. Despite the exceedingly close alignment between the state and the school, the Court found no "state action" under any theory.

Our Court of Appeals has expressed similar requirements for finding state action: "[W]here the question of race is not involved, it is necessary to show that the

Government exercises some form of control over the actions of the private party." *Spark v. Catholic University*, 510 F.2d 1277, 1281–82 (1975); *see also, DeFrantz v. United States Olympic Committee*, 492 F.Supp. 1181, 1194 (D.D.C.1980).

## B.

The National 4–H Council is a private, not-for-profit corporation organized under the laws of the State of Ohio. Private contributions by businesses and citizens and fees for services make up approximately 97 percent of the Council's income, with the remaining three percent derived from federal contracts and grants. Its day-to-day work is conducted by a staff hired and paid by the Council.

The Council is authorized to use the 4–H name and emblem pursuant to 18 U.S.C. § 707 and 7 C.F.R. Part 8, which provide that the Administrator of the Federal Extension Service at the Agriculture Department may authorize the use of the name and emblem in accordance with the regulations in 7 C.F.R. Part 8. Section 8.6(d) of Title 7 states in pertinent part:

All uses of the 4–H Club name or emblem shall be consistent with the educational purposes, character building objectives and dignity of the 4–H Club program . . . .

The corporate purposes of the Council are set forth in the Council's Articles of Incorporation. The Council's purpose is "complementing and supporting the work of the Cooperative Extension Service of the Land-Grant Institutions and the U. S. Department of Agriculture." The Articles further state that the Council "shall not carry on any activities inconsistent with the policies of the Cooperative Extension Service." [7]

The Ministry has filed a number of pleadings with the Court describing ways in which the Council is allegedly tied to the federal government. Its strongest assertions and representations are listed as follows:

---

7. Aff. of Grant A. Shrum (Nov. 11, 1981) at ¶ 8.

1. One of the Council's 20 trustees is a Department of Agriculture official, and one or two USDA officials sit on various Council committees.

2. Government officials "suggest" the pamphlets, books and educational aids which the Council might publish.

3. Council officials attend, but have no vote in, a USDA Extension Service subcommittee on the 4–H program.

4. The Council, one of ten authorized users of the 4–H name and emblem, provides the public with articles of clothing, stationery, banners, etc., bearing the 4–H label.

5. Council annual reports describe the relationship between the federal government and the Council with such terms as "strong partnership," "operating partnership," and "special partnership." [8]

6. A National 4–H Center brochure states that "the National 4–H Center is owned and operated by the National 4–H Council on behalf of the Cooperative Extension Service of the State Land-Grant Universities and the U. S. Department of Agriculture." [9]

7. An Extension Service subcommittee dealing with 4–H programming states that the Council "services, operates and/or conducts programs ... approved by the Cooperative Extension Service." [10]

The defendants have responded with uncontroverted affidavits of the Secretary of Agriculture and other government officials involved with the 4–H program and the Council. They state that the Council was voluntarily established to support the 4–H program and that the government does not control the activities or decisions of the Council. [11] As Mary Nell Greenwood, the Administrator of the Federal Extension Service with the responsibility for implementation of the 4–H program, states in her affidavit:

> The National 4–H Council is a completely private organization which is not affiliated with, an arm of, or under the control of the federal Extension Service. The ... Council performs no governmental function although many of its interests parallel those of the federal Extension Service. [12]

Hope Daugherty, 4–H program and youth leader in the USDA's Extension Service, states in her affidavit that the federal government does not oversee or direct the Council's programs, and the Council participates in programs organized and operated by the Extension Service solely by invitation. [13]

■ The affidavits establish that the Council is a wholly private organization, managing its own affairs and making its own decisions. [14] The mere working in concert of the government and the 4–H program does not establish a symbiotic relationship triggering constitutional limitations on private actions. Indeed, the relationship between the federal government and the Council is far less close than those between the government and the nursing

---

**8.** Exhibits SS through UU, Plaintiff's Supplemental Memorandum at Points and Authorities in Support of Motion for Summary Judgment (Jan. 22, 1982).

**9.** Exhibit K, Plaintiff's Supplemental Memorandum in Support of Motion for Temporary Restraining Order (Nov. 16, 1981).

**10.** Exhibit QQ, Plaintiff's Supplemental Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Jan. 22, 1982).

**11.** Affidavit of Eugene Williams, Deputy Administrator for the USDA's Extension Service (Nov. 10, 1981) at ¶¶ 2, 3; Supp.Aff. (Nov. 13, 1981) at ¶¶ 4, 5; Aff. of Grant Shrum (Nov. 11, 1981).

**12.** Aff. (Jan. 21, 1982) at ¶ 2.

**13.** Supp.Aff. (Jan. 22, 1982) at ¶¶ 3, 4, 6, 9, 10.

**14.** The Ministry's specific points relating to federal involvement in the Council's activities are far too numerous for a lengthy discussion in this opinion. The Court notes the Third Supplemental Affidavit of Eugene Williams (Feb. 4, 1982), in which each of the Ministry's factual allegations is discussed in detail, leading to the conclusion that: "Although [the Council] cooperates with federal and state governments it is not under their control." Aff. at ¶ 4.

home in *Blum* or the school in *Rendell-Baker*, neither of which led to a finding of state action.

The Ministry also asserts that government officials were involved in the decision to deny use of the Center, and more specifically that applications for use of the facility include a box for the signature of an approving Extension Service official. The approving official, by signing the application, certifies that: "This program is related to Extension Land-Grant University, and/or Government programs; and complies with the requirements of Title VI of the Civil Rights Act of 1964 and the State Cooperative Extension Service Affirmative Action Plan."

█ Despite this, however, the affidavits of the Council and federal officials make it clear that the Council, not the federal government, controls use of the Center. The Council determines when a group's proposed use is inconsistent with the purposes of the Council,[15] and federal officials are not advised of this decision. Federal officials, in other words, review applications only after they are approved by the Center staff. Thus, Daugherty's affidavit states that the USDA had no involvement in the Ministry's application and, in fact, did not learn about it until after the Center staff had informed Sister Gramick of the decision.[16]

Eugene Williams, Deputy Administrator of the Federal Extension Service, offers further explanations of this process and the significance of the box on the application form. He asserts in his affidavit:

In regard to the National 4–H Council, we do not routinely oversee their use of the Name and Emblem. However, we have been asked, by the Council, to sign off on already approved applications to use the National 4–H Center. We have not requested this involvement, and it is our understanding that it is only so that the Center can comply with its zoning agreement with the Township of Chevy Chase.[17] We have never had any reason to question this zoning agreement. We are not a party to it and we had no input into it.[18]

Williams further states that the federal government has "never overridden a Center decision to accept an application or attempted to reverse a decision to reject an application." Indeed, he states, "The federal Extension Service is without the authority to override a Council decision." He explains that, on one occasion, he made an "informal" suggestion of a minor change in a proposed program to make it consonant with 4–H goals and philosophies. That suggestion, he states, "was only a suggestion" and was not "binding upon the Council or the Center's management." [19]

█ The *Blum* decision erected a considerable hurdle for plaintiffs seeking to establish state action. The Court there stated: "[A] state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in

---

**15.** It appears to the Court that this determination is made in a rather arbitrary fashion. For instance, the Council has denied use of the facilities to Amnesty International, the National Lawyers Guild, the National Abortion Rights Action League, and the Maryland Right-to-Life Committee, while it has permitted use to the National Rifle Association, the National Coalition Against the Death Penalty, Gray Panthers, and Zero Population Growth. *See* Exhibits A through U, Plaintiff's Motion for Summary Judgment. Contrary to plaintiff's assertions, however, the arbitrariness of the decisions does not alter their fundamentally private character.

**16.** Aff. (Nov. 12, 1981) at ¶¶ 3–11.

**17.** The 4–H Council's special exception for operation of the Center permits use of the facilities "only by the [Council] and other activities related thereto." In a written agreement between the Council and the Town of Chevy Chase dated September 18, 1973, the Council agreed that non-4–H groups could use the Center only if the USDA's Extension Service or a director in the Cooperative Extension Service certifies that the group relates to the work and mission of the Cooperative Extension Service. Shrum Aff. (Nov. 11, 1981) at ¶ 14.

**18.** Second Supp.Aff. (Jan. 22, 1982) at ¶ 9.

**19.** *Id.* at ¶¶ 11–13.

**1280**

law be deemed to be that of the State." —— U.S. at ——, 102 S.Ct. at 2786. The decision of the Council was neither coerced nor significantly encouraged by the federal officials. Indeed, even if it could be said that the USDA officials tacitly approved or acquiesced in the decision—a conclusion which finds no support in the record—that involvement would not establish the required federal/private nexus. As the Court stated in *Blum*, "mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* Applying that principle to this case, the routine confirmation by federal officials that the Council's decisions conform to the applicable federal guidelines does not transform those decisions from private to state action.

### Conclusion

The Council's decision to deny the Ministry's application for use of its conference facilities did not constitute "state action" for purposes of the First and Fifth Amendments. The Ministry's motion for summary judgment is therefore denied, and the defendants' motions are granted.