Jonathan CAMPBELL, Plaintiff,

v.

CITY OF NEW YORK and the New York City Employees' Retirement System, Defendants,

No. 97 Civ. 0129(JES).

United States District Court, S.D. New York.

June 27, 2000.

Carroll & Fries, New York, NY (Rosemary Carroll, of counsel), for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, New York, NY (Magda M. Deconink, of counsel), for defendants.

### MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Jonathan Campbell ("plaintiff") brings the instant action pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution against defendants New York City and The New York City Employees' Retire-

ment System ("NYCERS"). Plaintiff claims that defendants deprived him of liberty and property without due process of law in finding him mentally incapacitated and by ordering his involuntary retirement as a New York City Transit Police Officer. For the reasons that follow, plaintiff's motion is denied, and defendants' cross-motion is granted.

## BACKGROUND

Plaintiff was appointed to the Police Department of the New York City Transit Authority ("NYCTA") on October 20, 1981, and on the same day became a member of NYCERS. *See* Defendants' Statement Pursuant to Local Rule 3(g) ("Def.Statement") at ¶ B1. During the course of his employment between 1982 and 1993, plaintiff was charged with a variety of disciplinary infractions, including insubordination, taking unauthorized leave, reporting late for duty, using ethnic slurs, and failing to appear for hearings. *See id.* at ¶¶ B2–B16. Such infractions resulted in approximately twelve disciplinary hearings and eleven suspensions of between two and seven days. *See id.*

Beginning in approximately 1989, plaintiff was repeatedly placed on sick leave and requested and received multiple medical leaves for stress and emotional problems. *See id.* at ¶¶ B17–B32. As a result of such problems, plaintiff was admitted to Hillside Hospital's psychiatric division and subsequently began to consult a private psychotherapist who diagnosed him with Impulsive Behavior Personality Disorder. *See id.* at ¶¶ B26, B30, B32. Around the same time, between September 1991 and June 1993, plaintiff was examined and interviewed by NYCTA medical personnel and underwent psychological examinations by at least four NYCTA doctors because of performance and attendance problems at work. *See id.* at ¶¶ B24, B27, B28–B29, B31, B33. Ultimately, on August 23, 1993, NYCTA applied for an involuntary retirement due to mental incapacity on plaintiff's behalf, citing his psychotherapist's diagnosis of Impulsive Behavior Personality Disorder and an NYCTA doctor's evaluation that such disorder required a permanent restricted work assignment. *See id.* at ¶¶ B33–B34; Def. Statement, Exhibit ("Exh.") 24, NYCTA Letter dated August 23, 1993.

### Involuntary Retirement Procedure

Upon receiving notice of the pendency of involuntary retirement proceedings against him, an NYCTA member and his counsel are entitled to all departmental files that will be considered by the Medical Board in reviewing his case.[1] *See id.* at ¶¶ B61–B62. The member and his counsel may also supplement such records with any written argument or additional medical or other evidence that they wish to submit. *See id.;* Plaintiff's Notice of Motion for Summary Judgment dated May 20, 1998 ("Plaintiff's Motion"), Exh. M, The New York City Employees' Retirement System Rules as Last Amended by the Board of Trustees on June 20, 1996 ("NYCERS' Rules"), at 13, ¶ 4. Thereafter, the member is to be interviewed by the Medical Board outside the presence of all others. *See* Def. Statement at ¶ B63. In its discretion, the Medical Board may refer the member to a psychiatrist, psychologist or other medical specialists for evaluation. *See id.* at ¶ B65. Following these procedures, the Medical Board is to prepare a written report which explains its reasons for finding the member should be involuntarily retired.[2] *See id.* at ¶ B66; NYCERS'

---

**1.** The Medical Board is comprised of three physicians. It includes one physician appointed by the NYCERS' Board of Trustees ("Board of Trustees"), one physician appointed by the Commissioner of Health, and one physician appointed by the Commissioner of Citywide Administrative Services. *See* N.Y.C. Admin. Code § 13–123(a)(1).

**2.** In preparing this report, the Medical Board is to "pass upon all medical examinations required under these [NYCERS' Rules], including where necessary, examinations by other medical consultants and shall investigate all essential statements and certifications made on behalf of a member in connection

Rules at 13, ¶ 6. Should the Medical Board find that the member is "mentally incapacitated for the performance of duty and ought to be retired," the Medical Board will recommend this action to the Board of Trustees. *See* N.Y.C. Admin. Code § 13–167(b); Def. Statement at ¶¶ B66–B67.

If the Medical Board recommends approval of the retirement application by the head of the agency, the member, his counsel or his union representative may appear before the Board of Trustees and present arguments on the propriety of the Board's recommendation. *See* Def. Statement at ¶ B68. Such arguments may also be presented in written form to the Board of Trustees. *See id.* The Board of Trustees is to independently consider the Medical Board's recommendation and uphold this recommendation if it concurs with the Medical Board's findings. *See id.* at B70; NYCERS' Rules at 13, ¶ 6. Alternatively, it may remand the case to the Medical Board if it finds procedural irregularities, if new evidence supports reconsideration, or if the recommendation is not supported by competent evidence. *See* Def. Statement at ¶¶ B61–B63.

If the Board of Trustees votes for involuntary retirement, the member may seek review in an Article 78 proceeding pursuant to New York's Civil Practice Law and Rules. *See id.* at ¶ B74; N.Y.C.P.L.R. § 7801 (McKinney's 2000). During such proceedings, a reviewing court may remand the application to the Board of Trustees or Medical Board if it finds that the determination was not supported by substantial evidence, was made in violation of lawful procedures, constituted an error of law, or was arbitrary or capricious. *See id.* at § 7803. Finally, a member that has been retired may seek reinstatement one year following his retirement through procedures virtually identical to the ones outlined above. *See* N.Y.C. Admin. Code § 13–171(a).

with an application for disability retirement."

*Plaintiff's Involuntary Retirement Proceeding*

The Medical Board considered NYCTA's involuntary retirement application on behalf of plaintiff for the first time on September 20, 1993. *See* Def. Statement at ¶ B35. Upon interviewing plaintiff and examining plaintiff's medical files and doctors' reports, the Medical Board deferred a final determination on plaintiff's incapacity pending a consultation with Dr. Mario Rendon, a psychiatrist. *See id.* Upon his examination, Dr. Rendon concluded that while plaintiff was not disabled, he was unsuited for full-time police work and it was difficult to predict how much stress he could learn to handle. *See id.* at Exh. 25, Psychiatric Evaluation of Mario Rendon, M.D. The Medical Board then again considered the agency's application for involuntary retirement on November 4, 1993, and, relying upon plaintiff's interview, Dr. Rendon's analysis and the other evidence before it, concluded that there was "sufficient documentary and clinical evidence to substantiate that [plaintiff was] disabled from performance of his duties as a police officer." *Id.* at Exh. 26, Medical Board Report dated November 4, 1993 ("1993 Med. Report"). It therefore recommended that the Board of Trustees approve the involuntary retirement application. *See id.*

Thereafter, plaintiff submitted additional evidence to the Board of Trustees, including a medical report from his treating psychotherapist. *See id.* at ¶ B39. On March 18, 1994, plaintiff appeared before the Board of Trustees with his union representative, who each requested that he be given more time on restricted duty prior to being involuntarily retired. *See id.* at ¶ B41. At the conclusion of this meeting, the Board of Trustees expressed its concern that plaintiff could not demonstrate whether his psychiatric condition would sufficiently improve to allow him to return to full duty and ultimately adopted the Medical Board's recommendation of invol-

*See* NYCERS' Rules at 13, ¶ 4.

untary retirement, effective May 22, 1994. *See id.* Exh. 29, Transcript of the NY-CERS' Board of Trustees Meeting on March 18, 1994 ("1994 Minutes"). In their discussion, the Trustees also indicated that plaintiff could apply for reinstatement each year after his retirement to demonstrate that he was now capable of full duty. *See id.* at 136–137.

Subsequently, plaintiff and his counsel made several attempts to secure reconsideration of the Board's decision pursuant to the "safeguard provision" of the New York City Administrative Code which allows for a re-examination of involuntary disability within one year of such finding. *See* N.Y.C. Admin. Code § 13–171. Ultimately, plaintiff initiated an Article 78 Proceeding to mandate a re-examination, and this suit was settled upon NYCERS' agreement to allow plaintiff to be re-examined by the Medical Board.[3] *See* Def. Statement at ¶ B47. In the interim, apparently at his own insistence, plaintiff was examined by a psychologist, Dr. Elaine Schwager, who concluded that plaintiff's personality problems would not prevent him returning to full time work as a police officer. *See id.* at ¶ B43.

Upon its second review, the Medical Board re-interviewed plaintiff and considered the full medical record, including the psychiatric reports of Dr. Schwager and Dr. Wayne Weisner, who also prepared a report at plaintiff's request recommending that he be returned to full duty. *See id.* at ¶¶ B48, B50. The Medical Board also considered the report of Board consultant Dr. Jochanan Weisenfreund who interviewed plaintiff and, after considering previous psychiatric evaluations of plaintiff (including that of Dr. Weisner, but not that of Dr. Schwager), ultimately concluded that plaintiff was not able to function as a police officer. *See id.* at ¶¶ B49–B50; Exh. 38, Medical Board Report dated August 1, 1995 ("1995 Med. Board Report"),

at 2. On the basis of such information, the Board again concluded that plaintiff was disabled from the performance of the duties of a police officer and recommended that no action should be taken to change his retirement status. *See id.*

The Board of Trustees then undertook its second review of plaintiff's case in which it re-interviewed plaintiff. *See id.* at ¶¶ B51–B52. At this stage, plaintiff, who appeared with an attorney, argued that he had not received a copy of Dr. Weisenfreund's report prior to his second interview with the Medical Board, and that Dr. Weisenfreund had not had access to Dr. Schwager's report prior to submitting his own findings. *See id.* The Board, upon concluding that Dr. Weisenfreund had not had access to this report, thus remanded the case to the Medical Board for plaintiff to be examined by yet another independent psychologist. *See id.* at ¶¶ B54. Thereafter, plaintiff was examined by psychologist Dr. Sambursky, who made findings consistent with those of both Dr. Rendon and Dr. Weisenfreund that plaintiff suffered from Impulsive Behavior Personality Disorder. *See id.* at ¶ B56. Moreover, Dr. Sambursky found that plaintiff's difficulties had not abated since his retirement, and that due to his personality disorder, plaintiff should remain on disability retirement. *See id.*

The Medical Board then again interviewed plaintiff and reviewed plaintiff's file, supplemented by both the report of Dr. Sambursky and a critique of such report by Dr. Schwager. *See id.* at ¶ B58. After examining the file, the Medical Board issued a written report acknowledging that it had reviewed the critique by Dr. Schwager, but found that it did not "constitute medical evidence that would rebut the findings of Dr. Sambursky and Dr. Weisenfreund, nor does it qualify Mr. Campbell to return to full duty and carry a gun." *See id.* at Exh. 46, Medical

---

**3.** The agreement further provided that the Medical Board would include a psychiatrist or, alternatively, plaintiff would be referred to a consulting psychiatrist who would examine plaintiff and provide him with a copy of his report. *See id.*

**252**

Board Report dated July 25, 1996 ("1996 Med. Report"), at 2. Accordingly, the Medical Board again recommended that plaintiff remain involuntarily retired. *See id.* Upon review, where the Trustees again heard the objections of plaintiff's counsel to the Medical Board's findings, the Trustees by resolution denied plaintiff's application for reinstatement. *See* Def. Statement, Exh. 47, NYCERS' Board of Trustees Meeting Minutes dated October 17, 1996 and NYCERS Cal. No. R. 17 ("1996 BOT Minutes").

Thereafter, plaintiff filed the instant action, claiming that he was not afforded due process of law in both the proceedings relating to his involuntary retirement and his subsequent request for reinstatement. Specifically, plaintiff alleges that such proceedings were constitutionally deficient because: 1) he was not provided with a full adversarial hearing before the Medical Board on the issue of whether he is psychologically disabled; 2) his counsel was not allowed to appear at hearings before the Medical Board; 3) meetings of the Board of Trustees were never memorialized in a verbatim transcript; and 4) a higher standard of proof should have been applied prior to the Medical Board and Trustee's finding that he was mentally incapacitated. *See* Plaintiff's Brief in Support of Motion for Summary Judgment dated May 20, 1998 ("Plaintiff's Brief"), at 4.

## DISCUSSION

To demonstrate a violation of Section 1983, a plaintiff must show that a person or entity, acting under color of state law, deprived him of the rights, privileges, or immunities guaranteed by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *see also Rendell–Baker v. Kohn*, 457 U.S. 830, 835, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662

(1986). The Fourteenth Amendment provides that a local or state government employer may not involuntarily retire plaintiff from his work as a transit police officer without due process of law. *See Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Due process requires notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■ According to the Supreme Court, this Court must weigh three factors in defining what process was due to plaintiff during the proceedings related to his involuntary retirement: (1) the importance of the individual interest affected by the official action; (2) the risk of an erroneous deprivation of this interest through the procedures used and the probable value of additional or alternative procedural safeguards; and (3) the government's interest in fiscal and administrative efficiency, and the burden additional or alternative procedures would entail. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

■ Under the first prong of *Mathews*, the Supreme Court has "frequently recognized the severity of depriving a person of [his] means of livelihood." *See Loudermill*, 470 U.S. at 543, 105 S.Ct. 1487. Moreover, a constitutional liberty interest is similarly implicated by the stigma associated with involuntary termination for mental incapacity. *See Lombard v. Board of Ed. of City of New York*, 502 F.2d 631, 637 (2d. Cir.1974). However, despite a tenured employee's interest in continuing to work, the Supreme Court has held that due process was satisfied when the employee was given pre-termination notice of the reason why he was being terminated and an opportunity to respond. *See Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487.

Under the second prong of *Mathews*, the adequacy of defendants' present procedures and the potential value of additional

or alternate procedures "depends largely on the purpose of the inquiry." *Basciano v. Herkimer*, 605 F.2d 605, 610 (2d Cir. 1978). Here, the purpose of retirement proceedings was foremost to make a medical determination of whether due to a mental incapacity plaintiff was incapable of performing his duties as a transit officer.

In accordance with this purpose, several aspects of plaintiff's involuntary retirement proceedings ensured that his medical condition would be properly evaluated. Initially, both before retirement and during his reinstatement hearings, plaintiff was entitled to review all of the NYCTA files to be considered by the Medical Board and could supplement such files with any additional evidence, medical or otherwise, that he believed was relevant. Further, plaintiff personally appeared before the Medical Board, and, to ensure that such physicians had a proper familiarity with his condition, at his and/or the Medical Board's insistence, plaintiff was examined by *five* different physicians during the course of these proceedings. Plaintiff was then provided with the Medical Board reports detailing why the Board found evidence in his favor unpersuasive. Ultimately, it was these reports that the Board of Trustees relied upon in making its own decisions regarding plaintiff's retirement, and plaintiff had the opportunity to and did present extensive evidence in rebuttal of such reports prior to the Board of Trustees' decisions.

■ Given the extensive nature of such proceedings the Court must conclude that plaintiff was not deprived of an adequate opportunity to be heard prior to his retirement. This is particularly the case, where, as here, the Medical Board and the Board of Trustees took pains to examine and address evidence in favor of plaintiff prior to concluding that such evidence was unpersuasive in light of other evidence. Indeed, given plaintiff's vigorous opposition to retirement, it is clear that the Medical Board and the Board of Trustees were fully appraised of plaintiff's mental condition prior to making their decisions, and accordingly, the risk of an erroneous determination was minimal.[4] *See* 1993 Med. Report, 1994 BOT Minutes, 1995 Med. Report, 1996 Med. Report, 1996 BOT Minutes.

Likewise, plaintiff's recommended procedural safeguards must be rejected. Initially, while plaintiff argues that he was entitled to due process protections like an adversarial hearing and the assistance of counsel during all Medical Board proceedings, the Supreme Court has specifically rejected the necessity of such measures in the context of psychiatric medical determinations, even if they ultimately result in involuntary commitment:

> Although we acknowledge the fallibility of medical and psychiatric diagnosis ... we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even af-

---

4. It should also be noted that this Court has upheld the constitutionality of involuntary psychiatric retirement procedures that are virtually identical to those at issue here. *See Wright v. Safir*, 983 F.Supp. 484 (S.D.N.Y. 1997). *Wright* involved a challenge to the procedures for involuntary retirement of a City police officer whereas the instant case involves the procedures for the retirement of a transit police officer. *See id.* at 487. The primary difference between such procedures is that in the case of a police officer, the member may have a health professional appear on his behalf before the Medical Board, whereas a transit police officer may not have a health professional appear on his behalf. *See* Plaintiff's Brief, Exh. N, Procedures in Psychological Disability Cases Initiated by the Police Commissioner, at ¶ 8. The value of this additional safeguard, however, is negligible as the Medical Board is able to and did in this case request an additional psychiatric examination of plaintiff, and plaintiff throughout these proceedings submitted several medical evaluations from his own doctors to the Medical Board and Board of Trustees. *See* Def. Statement at ¶¶ B41, B43, B48.

ter a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.

*Washington v. Harper*, 494 U.S. 210, 232, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (quoting *Parham v. J.R.*, 442 U.S. 584, 607–09, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)); *see also Wright*, 983 F.Supp. at 487.

Moreover, while plaintiff claims that the Constitution requires that he be represented by counsel or a medical professional during his interview with the Medical Board, this Court concludes otherwise. Given the medical nature of this interview (which is conducted by three doctors) it is not unreasonable that plaintiff appear individually. Moreover, NYCERS' procedures provide ample opportunity for both counsel as well as others to fully participate on plaintiff's behalf before and after this interview takes place. Indeed, as was his right, plaintiff and his counsel submitted written objections and new medical evidence to both the Medical Board and, upon its adverse recommendation, the Board of Trustees. Counsel also appeared before the Board of Trustees to argue that the Medical Board's findings were in error, and ultimately vigorous representation by counsel forced a remand to the Medical Board for even further findings during reinstatement procedures. Such facts demonstrate that plaintiff had a full opportunity to be heard under *Mathews*, and no further safeguards in this respect were

necessary. *See also Wright*, 983 F.Supp. at 487.

Finally, while plaintiff argues that due process requires that his Medical Board interview be memorialized in a verbatim transcript, he provides the Court with no explanation as to how this procedure could reduce the risk of an erroneous deprivation of his rights. In any event, the benefit of such procedure is minimal given that the Medical Board must provide the Board of Trustees with a report that outlines the basis for its determination and the reasons for its disagreement with contrary evaluations. As noted above, this report is provided to plaintiff before consideration by the Board of Trustees, and either plaintiff or his counsel may object to the report and present new evidence to contradict it. Accordingly, plaintiff and his counsel had sufficient notice of the reasons for the Medical Board's adverse determination and face little if any prejudice in rebutting its conclusions.[5]

Finally, New York City has a very substantial interest in avoiding the administrative costs of establishing trial-type hearings when determining the type of pension to which a member is entitled. *Accord Basciano*, 605 F.2d at 611. In the instant case, where plaintiff demonstrates a minimal risk of erroneous deprivation of his liberty or property and the value of additional procedural safeguards is minimal, this state interest renders additional procedural safeguards unnecessary. Accordingly, the Court concludes that plaintiff's claims that he was denied due process in being involuntarily retired from his employment are without merit.

## CONCLUSION

For the reasons stated herein, plaintiff's motion for summary judgment is denied

---

**5.** Plaintiff also claims generally that a higher standard of review should have been employed by the Medical Board and the Board of Trustees in finding plaintiff disabled from his employment. *See* Plaintiff's Brief at 16. Plaintiff, however, presents the Court with no evidence that either the Medical Board or the Board of Trustees employed an improper standard in evaluating his case. In any event, the extensive reports and analysis by both the Medical Board and the Board of Trustees make clear that the findings of such bodies were supported by a preponderance of the evidence. *See* 1993 Med. Report, 1994 BOT Minutes, 1995 Med. Report, 1996 Med. Report, 1996 BOT Minutes.

and defendant's cross-motion for summary judgment is granted. The Clerk of the Court is directed to close the above-captioned action.

It is **SO ORDERED.**